DIVERSICARE GENERAL PARTNER, INC., Diversicare Leasing Corporation, Advocat, Inc., and Texas Diversicare Limited Partnership d/b/a Goliad Manor, Petitioners,

v.

Maria G. RUBIO and Mary Holcomb as Next Friend of Maria G. Rubio, Respondents.

No. 02–0849.

Supreme Court of Texas.

Argued Sept. 24, 2003.

Decided Oct. 14, 2005.

Rehearing Denied Dec. 9, 2005.

Dorothy Siemon, for Amicus Curiae AARP and The National Citizens.

Robert A. Shults, for Amicus Curiae Living Centers of Texas, Inc.

Stephen R. Darling, Gonzales Hoblit Ferguson LLP, San Antonio, Audrey Mullert Vicknair, Law Office of Audrey Mullert Vicknair, Joel Cruz Resendez, Chaves Resendez & Rivero, Corpus Christi, for Petitioners.

Henry P. Giessel, David T. Marks, The Marks Firm, and T. Gerald Treece, Houston, for Respondents.

Justice WAINWRIGHT delivered the opinion of the Court, in which Justice HECHT, Justice MEDINA, Justice JOHNSON, and Justice WILLETT joined, and in which Chief Justice JEFFERSON joined as to Part III(B)(3).

We address for the first time whether the Medical Liability Insurance Improve-

ment Act (MLIIA or the Act) governs a patient's claims that a nursing home's negligence in failing to provide adequate supervision and nursing services proximately caused her injuries from a sexual assault by another patient. We conclude that the nursing home resident's claims in this case are causes of action for departures from accepted standards of professional health care and safety. Therefore, the causes of action constitute health care liability claims under the MLIIA and are governed by the two-year statute of limitations prescribed by the statute.

## I. Factual and Procedural Background

From August 1, 1994 to January 17, 1999, Maria Rubio was a resident of Goliad Manor nursing home. She suffered from Senile Dementia of the Alzheimer's Type, rendering her mentally incapacitated for the duration of her stay at Goliad.

On July 14, 1999, Rubio's daughter, Mary Holcomb, as next friend, brought suit on Rubio's behalf against Diversicare General Partner, Inc., Diversicare Leasing Corporation, Advocat, Inc., and Texas Diversicare Limited Partnership doing business as Goliad Manor (collectively Diversicare) for injuries Rubio sustained in two separate falls while a resident at the facility. She alleged that Diversicare and its staff were negligent in failing to provide adequate supervision and nursing services to meet her fundamental needs; failing to budget for, hire, and train a sufficient number of qualified direct health care staff; failing to develop and implement adequate policies and procedures for safety, training, and staffing at its nursing homes; and for violations of section 22.04 of the Texas Penal Code entitled "Injury to Child, Elderly, or Disabled Individual." Rubio also brought a claim for breach of contract asserting that, as a Medicaid re-

cipient, she was a third-party beneficiary to a contract between Diversicare and the Texas Department of Human Services under the Texas Medical Assistance Program.

On September 26, 2000, Rubio amended her petition to include damages arising from the alleged failure of Diversicare and its staff to adequately supervise and monitor Rubio to protect her from sexual abuse and assault by another resident in violation of sections 22.011 and 22.021 of the Texas Penal Code. She alleges multiple incidents of sexual assault occurring between October 1994 and April 1995. The summary judgment evidence identifies one incident that took place on April 25, 1995. A nurse entered Rubio's room and discovered a male resident straddling Rubio on the bed. Both Rubio's daughter and her physician were informed of the incident shortly after it occurred. Rubio remained a resident at Goliad Manor for another three and one-half years.

Rubio also added in her amended petition a claim for breach of an implied covenant to provide reasonably safe premises in which Rubio was a third-party beneficiary of the contract between Diversicare and the Texas Department of Human Services. Rubio further claimed fraudulent inducement, alleging that the facility represented that it would provide for her safety.

Diversicare moved for summary judgment on all of Rubio's claims arising from the alleged sexual assaults, arguing that the MLIIA's two-year statute of limitations barred recovery on the claims. The district court severed all the claims arising from the assaults and granted Diversicare's motion for summary judgment. The court of appeals reversed, holding that Rubio's claims arising from the alleged assaults are claims for common law negligence and are not covered by the MLIIA. 82 S.W.3d 778, 783–84. The court conclud-

ed that Rubio's mental incapacity tolled the statute of limitations for personal injury claims, as provided by section 16.003 of the Texas Civil Practice and Remedies Code. *Id.* at 781–82. Diversicare petitioned this Court for review.

## II. Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and judgment should be granted in favor of the movant as a matter of law. *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999). A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense, including the accrual date of the cause of action. *Id.; see also Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 220 (Tex.2003). If the movant establishes that the statute of limitations bars the action, the nonmovant must then adduce summary judgment proof raising a fact issue in avoidance of the statute of limitations. *KPMG Peat Marwick*, 988 S.W.2d at 748. When reviewing a summary judgment, we take as true all competent evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex.2002) (citing *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex.1997)). In reviewing a summary judgment, we consider all grounds presented to the trial court and preserved on appeal in the interest of judicial economy. *Knott*, 128 S.W.3d at 216; *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex.1996).

In this case, the commencement date of the limitations period for the claims arising from the alleged sexual assaults depends upon whether the statute of limitations in the MLIIA or the Texas Civil Practice and Remedies Code applies. If the Texas Civil Practice and Remedies Code applies, the limitations period is tolled, and Rubio's claims are not barred. If the MLIIA supplies the statute of limitations, the limitations period is not tolled and Rubio's claims are barred. We note that for limitations purposes the parties do not dispute that the assaults occurred no later than 1995.

## III. Discussion

In the MLIIA, the Legislature modified the liability laws relating to health care claims to address what the Legislature described as a medical "crisis [that] has had a material adverse effect on the delivery of medical and health care in Texas." Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02(6), 1977 Tex. Gen. Laws 2039, 2040 (former Tex.Rev.Civ. Stat. art. 4590i, § 1.02(6)), *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884; *see also* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11, 2003 Tex. Gen. Laws 847, 884 (reiterating the Legislature's concern about the gravity of an ongoing "medical malpractice insurance crisis" caused in part by an increased number of health care liability claims since 1995).[1] The Legislature instituted heightened requirements for filing and maintaining lawsuits that assert professional liability claims against health care providers, shortened the statute of limitations and restricted tolling for such claims, and

---

1. While this case was pending on appeal, the Legislature repealed the MLIIA, amended parts of the previous article 4590i, and recodified it in 2003 as chapter 74 of the Texas Civil Practice and Remedies Code. Act of June 2, 2003, 78th Leg., R.S., ch. 204, 2003 Tex. Gen. Laws 847. Because article 4590i continues to govern this case, we will cite the former article rather than the Civil Practice and Remedies Code.

capped certain types of damages recoverable from these lawsuits. Rubio asserts that her claims are not governed by the MLIIA and, therefore, are not barred by the statute of limitations because her claims are tolled by statutory provisions in the Texas Civil Practice and Remedies Code.

### A. Statute of Limitations for Health Care Liability Claims

Rubio filed suit in July 1999 for injuries from two alleged falls at Goliad Manor. In September 2000, nearly five and one-half years after the alleged assaults took place, she amended her complaint to plead claims for sexual assaults by another nursing home resident during 1995. Rubio argues that because her claims are not health care liability claims under the MLIIA, they are governed by the general statute of limitations for personal injury claims, which tolls the statute of limitations due to mental incapacity. Tex. Civ. Prac. & Rem.Code §§ 16.001(b), 16.003. Diversicare argues that these claims are barred by the two-year statute of limitations under the MLI-IA, which does not provide for tolling based on mental incapacity.[2] The parties agree that Rubio was mentally incapacitated during her entire stay at Goliad Manor.

Section 10.01 of the MLIIA states:

Notwithstanding any other law, no health care liability claim may be commenced unless the action is filed within two years from the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or the hospitalization for which the claim is made is

completed.... Except as herein provided, this subchapter applies to all persons regardless of minority or other legal disability.

Former TEX.REV.CIV. STAT. art. 4590i, § 10.01. The MLIIA's two-year statute of limitations applies to health care liability claims as defined by the statute.[3]

■ To determine whether a cause of action is a health care liability claim that falls under the rubric of the MLIIA, we examine the underlying nature of the claim and are not bound by the form of the pleading. See Sorokolit v. Rhodes, 889 S.W.2d 239, 242 (Tex.1994). The MLIIA defines a health care liability claim as:

a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury to or death of the patient, whether the patient's claim or cause of action sounds in tort or contract.

Former TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(4). "Health care" is broadly defined as "any act or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." Id. § 1.03(a)(2). A nursing home is a health care provider. Id. § 1.03(a)(3). In this case, we must determine if Rubio's claims for inadequate supervision and nursing services to protect her from assault and meet her health care needs during confinement in the nursing home are governed by the MLIIA.

---

**2.** Plaintiffs did not raise constitutional challenges concerning the tolling provisions in the MLIIA.

**3.** The two-year statute of limitations, by its terms, may be tolled for up to 75 days by

giving written notice as provided in the Act or for minors under the age of 12 until their 14th birthday. Former Tex.Rev.Civ. Stat. art. 4590i, §§ 4.01(c), 10.01. These provisions are not at issue in this case.

A cause of action against a health care provider is a health care liability claim under the MLIIA if it is based on a claimed departure from an accepted standard of medical care, health care, or safety of the patient, whether the action sounds in tort or contract. *Id.* § 1.03(a)(4); *MacGregor Med. Assoc. v. Campbell,* 985 S.W.2d 38, 41 (Tex.1998); *Gormley v. Stover,* 907 S.W.2d 448, 449 (Tex.1995); *Sorokolit,* 889 S.W.2d at 242; *Mulligan v. Beverly Enters.-Tex., Inc.,* 954 S.W.2d 881, 884 (Tex.App.-Houston [14th Dist.] 1997, no pet.); *Waters ex rel. Walton v. Del-Ky, Inc.,* 844 S.W.2d 250, 258–59 (Tex.App.-Dallas 1992, no writ). A cause of action alleges a departure from accepted standards of medical care or health care if the act or omission complained of is an inseparable part of the rendition of medical services. *See* former Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(2), (4); *Walden v. Jeffery,* 907 S.W.2d 446, 448 (Tex.1995); *Shaw v. BMW Healthcare, Inc.,* 100 S.W.3d 8, 15 (Tex.App.-Tyler 2002, pet. denied).

■ The necessity of expert testimony from a medical or health care professional to prove a claim may also be an important factor in determining whether a cause of action is an inseparable part of the rendition of medical or health care services. *Garland Cmty. Hosp. v. Rose,* 156 S.W.3d 541, 544 (Tex.2004); *see, e.g., Bush v. Green Oaks Operator, Inc.,* 39 S.W.3d 669, 674 (Tex.App.-Dallas 2001, no pet.) (Dodson, J. dissenting) ("Further, the claims in this case are of the type that would require expert testimony as to the appropriate standard of care in segregating patients in a psychiatric hospital...."); *Rogers v. Crossroads Nursing Serv., Inc.,* 13 S.W.3d 417, 419 (Tex.App.-Corpus Christi 1999, no pet.). *But see Haddock v. Arnspiger,* 793 S.W.2d 948, 951 (Tex.1990) (noting that expert testimony is not needed to establish breach of a medical duty where the depar-

ture is plainly within the common knowledge of laymen, such as leaving a sponge in a patient after surgery).

In *Walden,* this Court held that a claim for ill-fitting dentures is a health care liability claim governed by the MLIIA. 907 S.W.2d at 448. Lena Jeffery sued her dentist Dr. Terry Walden for breach of implied warranty, breach of contract, and DTPA violations for failure to provide dentures that fit. *Id.* at 447. We held that providing dentures was inseparable from health care provided to the patient as part of the provision of professional dental services. *Id.* at 448.

In *Shaw,* the court of appeals, following our decision in *Walden,* held that a plaintiff could not bring a claim for intentional elder abuse separate from his MLIIA claim for negligence because the alleged negligent administration of an overdose of sedatives to a nursing home resident constituted a breach of the standard of care for a health care provider. *Shaw,* 100 S.W.3d at 15. Shaw, a patient, was administered sedatives to restrain him from possible injury by wandering around the facility. *Id.* at 10. He was hospitalized and a month later developed very high blood sugar levels and died. *Id.* at 10–11.

Shaw argued that the nursing home was negligent in allowing its nursing staff to administer chemical restraints to Shaw and that this conduct gave rise to two independent causes of action: one for negligence governed by the MLIIA and one for intentional elder abuse outside the scope of the Act. *Id.* at 14. The court of appeals held that the claim for intentional elder abuse was in substance a claim for breach of the applicable standard of care for a health care provider governed by the MLIIA. *Id.* at 15. Therefore, dismissal of the claim was proper because the plaintiff did not file an expert report as mandated by the statute. *Id.* The court noted

that the facts which gave rise to Shaw's MLIIA claims were the same as those relied upon for his claim for intentional elder abuse, and both were based on breaches of the accepted standard of care for a health care provider. *Id.* The court of appeals correctly recognized that if the act or omission that gave rise to the claim is so integral to the rendition of medical services by the provider to be an inseparable part of those services, it constitutes a breach of the standard of care applicable to health care providers and is governed by the MLIIA. *See id.*

In *Waters,* Will Walton, a nursing home patient who required constant attention, fell from a second-story window. 844 S.W.2d at 252. He died four days later as a result of the injuries he sustained in the fall. *Id.* His sister, Ruby Mae Waters, brought suit against the nursing home under the Texas Survivorship statute and the Texas Deceptive Trade Practices Act for her brother's injuries on the ground that the nursing home failed to provide him with appropriate physical and medical care. *Id.* at 252–53. Waters's DTPA action was based on the nursing home's alleged express warranty that it would provide, *inter alia,* adequate medical care evaluation and sufficient qualified personnel to properly supervise her brother. *Id.* at 254.

The court of appeals held that the MLIIA applied because the negligent supervision of a helpless resident was a claim for deviations from the applicable standard of care for the nursing home even if the claim is framed as a misrepresentation or failure to comply with an express warranty. *Id.* at 258–59. In *Waters,* the court of appeals rejected the contention that the legal disability of unsound mind contained in the general tolling statute tolls the two-year statute of limitations in MLIIA's section

10.01. *Id.* at 256. We apply these legal tenets to Rubio's claims.

## B. Rubio's Claims

### 1. Health Care

■ For the reasons that follow, we conclude that Rubio's causes of action are claims for breaches of the standard of care for a health care provider because the supervision of Rubio and the patient who assaulted her and the protection of Rubio are inseparable from the health care and nursing services provided to her.

Rubio, in her amended petition, asserts that Goliad Manor held itself out to the public as a nursing home facility competent and qualified to provide nursing home services with all the necessary care and precaution expected of a nursing home facility. Rubio contends that Goliad failed to hire and train appropriate personnel to monitor her, failed to provide 24–hour nursing services from a sufficient number of qualified nursing personnel to meet the total nursing needs of Rubio, hired incompetent staff who were unqualified to care for her, and failed to establish and implement appropriate safety policies to protect its residents.

A nursing home provides services to its patients, often around the clock, which include supervising daily activities; providing routine examinations and visits with physicians; providing dietary, pharmaceutical, and routine dental services; monitoring the physical and mental conditions of its residents; administering medications; and meeting the fundamental care needs of the residents. *See* TEX. HEALTH & SAFETY CODE § 242.001; *see also* 42 U.S.C. § 1396r(b)(4)(A). These fundamental needs include, where necessary, feeding, dressing, assisting the resident with walking, and providing sanitary living conditions. *See* 40 TEX. ADMIN. CODE § 19.901(1). These services are provided

by professional staff including physicians, nurses, nurse aides, and orderlies who care for the residents.

The level and types of health care services provided vary with the needs and capabilities, both physical and mental, of the patients. *See Harris v. Harris County Hosp. Dist.*, 557 S.W.2d 353, 355 (Tex. Civ.App.-Houston [1st Dist.] 1977, no writ). Nursing homes are required to assess each resident's needs and capabilities, including life functions and significant impairments. 40 Tex. Admin. Code §§ 19.101(23), 19.801. The law requires these facilities to prepare a comprehensive care plan to address the resident's medical, nursing, mental, psychosocial, and other needs. *Id.* §§ 19.101(24), 19.802. This plan must meet "professional standards of quality." *Id.* § 19.802(d)(1). Some patients need psychological treatment, while others require none. Some patients require enhanced supervision and additional staff or physical restraints to protect them from injuring themselves and others or to protect them from other patients, while other patients do not require such protections. The nature and intensity of care and treatment, including professional supervision, monitoring, assessment, quantities and types of medication, and other medical treatment are judgments made by professionals trained and experienced in treating and caring for patients and the patient populations in their health care facilities.

■ The supervision and monitoring of Rubio and other nursing home residents and nursing services provided to Rubio by Diversicare's staff were part of her health care. The nursing home provided for Rubio's fundamental needs including assuming care and custody of this elderly patient. Professional supervision and nursing services were provided to Rubio and the other residents. The staff at Goliad Manor was obligated to take care of Rubio and Goliad's patient population and to protect her and the patient population from harming themselves and each other. Contrary to Rubio's argument, this dispute concerns more than simply determining whether a person should be protected from a "known" attacker. This dispute between the parties is, at its core, over the appropriate standard of care owed to this nursing home resident; what services, supervision, and monitoring were necessary to satisfy the standard; and whether such specialized standards were breached. Diversicare's training and staffing policies and supervision and protection of Rubio and other residents are integral components of Diversicare's rendition of health care services to Rubio.

Rubio posits that if she had been a visitor to Goliad Manor when she was sexually assaulted, there would be no argument that the Act does not apply. The result in this case, she claims, should be no different simply because the victim was a resident of a nursing home and the sexual assault happened to occur in a health care facility. Rubio's hypothetical highlights the distinction between health care liability claims and premises liability claims. There is an important distinction in the relationship between premises owners and invitees on one hand and health care facilities and their patients on the other. The latter involves health care.

■ The obligation of a health care facility to its patients is not the same as the general duty a premises owner owes to invitees. Health care staff make judgments about the care, treatment, and protection of individual patients and the patient populations in their facilities based on the mental and physical care the patients require. The health care standard applies the ordinary care of trained and experienced medical professionals to the treatment of patients entrusted to them. *See*

*Baptist Mem'l Hosp. Sys. v. Sampson,* 969 S.W.2d 945, 949 (Tex.1998). Premises owners similarly owe a duty of care to their residents and invitees, but the duty is of ordinary care with no general medical duty to diagnose and treat their residents. *See Meeks v. Rosa,* 988 S.W.2d 216 (Tex. 1999). This distinction defeats Rubio's analogy. Residents are in a nursing home for care and treatment, not merely for shelter. *See, e.g.,* TEX. HEALTH & SAFETY CODE §§ 242.001, 242.151–.157, 242.401–.404; 40 TEX. ADMIN. CODE §§ 19.801–.1701.

▮ In addition, we focus on the essence of Rubio's claim and consider the alleged wrongful conduct and the duties allegedly breached, rather than the unfortunate injuries she suffered. *Rose,* 156 S.W.3d at 543 ("Plaintiffs cannot use artful pleading to avoid the MLIIA's requirements when the essence of the suit is a health care liability claim."). It is well settled that a health care liability claim cannot be recast as another cause of action to avoid the requirements of the MLIIA. *MacGregor Med. Assoc.,* 985 S.W.2d at 38; *Gormley,* 907 S.W.2d at 450; *Sorokolit,* 889 S.W.2d at 242. We "are not bound by niceties of pleadings, and a mere 'recasting' of a health care liability claim based on physician or health care provider negligence in the garb of some other cause of action is not sufficient to preclude the application of Article 4590i." Glen M. Wilkerson, David M. Davis, Wes Cleveland, & Michael P. Young, *Analysis of Recent Attempts to Assert Medical Negligence Claims "Outside" Texas's Article 4590i,* 20 REV. LITIG. 657, 679 (2001). Rubio's claim is *not* that Diversicare, through its employees and agents, committed the sexual assault. Rubio claims that through lapses in professional judgment and treatment Diversicare negligently allowed the sexual assault to occur.

▮ A factor we consider is whether expert testimony is necessary to prove these alleged lapses in professional judgment and treatment. Is expertise in the health care field required to determine the appropriate number, training, and certifications of medical professionals necessary to care for and protect patients in weakened conditions from injury by other patients in a health care facility? We think so. It is not within the common knowledge of the general public to determine the ability of patients in weakened conditions to protect themselves, nor whether a potential target of an attack in a healthcare facility should be better protected and by what means. The general public is not trained to evaluate whether a potential attacker admitted to a health care facility should be physically or chemically restrained to prevent harm to other patients or if other patients should be better protected through increased supervision. And the general public does not know whether physical restraint is required to prevent assaults by a resident, if certain types of medication are sufficient, or if a combination of the two may be required, and to what degree these determinations depend on the propensities and physical and mental characteristics of the resident. We note that federal law requires the judgment and written order of a physician to chemically or physically restrain a potential attacker in a nursing home. 42 U.S.C. § 1396r(c)(1)(A)(ii); *see Torres v. State,* 49 A.D.2d 966, 373 N.Y.S.2d 696, 697 (N.Y.App.Div.1975) ("[T]he decision to place decedent under only limited restraints was a medical judgment...."). Nor does the general public know the myriad of other questions that may need to be asked, much less answered, in making such professional judgments. *See SunBridge Healthcare Corp. v. Penny,* 160 S.W.3d 230, 246 (Tex.App.-Texarkana 2005, no

pet.) (stating that standards for nursing home budgets and staffing levels are "issues not within the common knowledge or experience of the jury").

Two other state supreme courts that addressed this issue reached the same reasoned conclusion that claims for assault under similar circumstances implicate medical or health care under their applicable medical malpractice statutes. *Dorris v. Detroit Osteopathic Hosp.*, 460 Mich. 26, 594 N.W.2d 455 (1999); *Smith v. Four Corners Mental Health Ctr., Inc.*, 70 P.3d 904 (Utah 2003). One supreme court reached a contrary conclusion. *See Afamefune ex rel. Afamefune v. Suburban Hosp., Inc.*, 385 Md. 677, 870 A.2d 592, 599, 602–03 (2005) (holding that because "no active or direct" health care was being rendered when one patient raped or attempted to rape another patient, the case did not implicate state's medical malpractice act).

In *Dorris*, the Michigan Supreme Court considered a psychiatric patient's claims that during a hospital stay, a fellow patient pushed her to the floor and beat her. 594 N.W.2d at 458. The alleged victim of the battery sued the hospital, alleging that the hospital had inadequate staffing to supervise and monitor the behavior of its patients under psychiatric care. *Id.* The Michigan Supreme Court considered whether a hospital's alleged failure to supervise and monitor patients is a medical malpractice action, thus requiring the satisfaction of certain procedural, statutory requirements.[4] *Id.* at 464–66. The court held that "[t]he determination whether a claim will be held to the standards of proof and procedural requirements of a medical malpractice action claim as opposed to an ordinary negligence claim depends on whether the facts allegedly raise issues that are within the common knowledge and experience of the jury or, alternatively, raise questions involving medical judgment." *Id.* at 465. The Michigan Supreme Court also determined that "[t]he ordinary layman does not know the type of supervision or monitoring that is required for psychiatric patients in a psychiatric ward." *Id.* at 466. It concluded that the patient's suit was a medical malpractice action. *Id.*

The Utah Supreme Court considered whether a claim by a child placed in a foster home and sexually assaulted by another child placed in the same home, while both were receiving mental health care services from the same facility, was a health care malpractice claim. *Smith*, 70 P.3d at 913–14. The Court held that the assaulted child's lawsuit against the outpatient mental health care provider was a health care malpractice claim because the plaintiff's "allegations arise out of the fact that [a health care provider] provided mental health services directly to him." *Id.* at 914.

Two other state supreme courts have likewise reasoned that professional decisions on supervising or restraining patients at health care facilities require medical judgment. *See D.P. v. Wrangell Gen. Hosp.*, 5 P.3d 225, 229 n. 17 (Alaska 2000) ("[I]n so far as [plaintiff] intends to argue issues that involve specialized medical decisions—such as the appropriate level of physical restraints or medication"—she must fulfill the requirements of the malpractice act.); *Regions Bank & Trust v. Stone County Skilled Nursing Facility, Inc.*, 345 Ark. 555, 49 S.W.3d 107, 113 (2001) ("[A] nursing home[ ] is required to

4. Michigan's statute imposes certain notice, affidavit, and other procedural requirements in actions "alleging medical malpractice against a health professional or health facility." Mich. Comp. Laws § 600.2912b.

consider the patient's capacity to care for himself or herself and to protect the patient from dangers created by his or her weakened condition. Providing a safe environment for patients is within the scope of the professional services of a hospital or nursing home."). A number of other state appellate courts have applied the same logic. *See Bell v. Sharp Cabrillo Hosp.,* 212 Cal.App.3d 1034, 260 Cal.Rptr. 886, 896 (1989) ("[T]he competent selection and review of medical staff is precisely the type of professional service a hospital is licensed and expected to provide, for it is in the business of providing medical care to patients and protecting them from an unreasonable risk of harm while receiving medical treatment.... [T]he competent performance of this responsibility is 'inextricably interwoven' with delivering competent quality medical care to hospital patients."); *Ogle v. St. John's Hickey Mem'l Hosp.,* 473 N.E.2d 1055, 1059 (Ind.Ct.App. 1985) (holding that the malpractice act governed the alleged failure to protect a psychiatric patient from sexual assault because her confinement was integral to her diagnosis and treatment); *M.W. v. Jewish Hosp. Assoc. of St. Louis,* 637 S.W.2d 74 (Mo.Ct.App.1982) (holding that a claim for improper supervision allowing a schizophrenia patient in a hospital neuro-psychiatric ward to engage in sexual relations with other patients is a claim for medical malpractice and not for failure to use ordinary care). *But see Sumblin v. Craven County Hosp. Corp.,* 86 N.C.App. 358, 357 S.E.2d 376, 378–79 (1987) (holding that the alleged failure to protect a hospital patient from assaults by another patient does not involve the failure to render professional nursing or medical services).

We do not declare that health care providers have no duty to prevent assaults between inpatients. However, we recognize that judgments concerning health and medical care, including protection of patients, are made by health care professionals as part of the care and treatment of the patients admitted to their facilities. The Legislature has determined that alleged breaches of these standards are health care liability claims. *See* former Tex.Rev. Civ. Stat. art. 4590i, § 1.03(a)(4).

In support of her argument that the MLIIA does not govern her claims against Diversicare, Rubio relies on several cases decided by courts of appeals holding that sexual assaults in health care facilities perpetrated by one patient against another are claims for ordinary negligence, not health care liability claims under the MLI-IA. *See Healthcare Ctrs. of Tex., Inc. v. Rigby,* 97 S.W.3d 610, 616–17 (Tex.App.-Houston [14th Dist.] 2002, pet. denied); *Zuniga v. Healthcare San Antonio, Inc.,* 94 S.W.3d 778, 780 (Tex.App.-San Antonio 2002, no pet.); *Bush,* 39 S.W.3d at 670; *Sisters of Charity of the Incarnate Word, Houston, Tex. v. Gobert,* 992 S.W.2d 25, 27 (Tex.App.-Houston [1st Dist.] 1997, no pet.). Other Texas courts of appeals have reached the opposite result in analogous situations. *See, e.g., Shaw,* 100 S.W.3d 8; *Waters,* 844 S.W.2d 250.

In the cases cited by Rubio, patients who were in weakened conditions or suffered from reduced mental capacities were sexually assaulted by other patients at the facilities. The victims' claims in these cases were based on inadequate monitoring, supervision, and health care. For the reasons explained, we disapprove of these decisions to the extent they hold that the patients' claims for assault by other patients are not health care liability claims, as the Legislature defined that term.

Finally, we note the irony in Rubio's position. She asserts that the MLIIA should not apply to her claim, which she contends is a premises liability claim based on ordinary negligence. If we were to

agree with her, our decision would have the effect of lowering the standard from professional to ordinary care for residents in health care facilities under similar circumstances. While we make no general pronouncements in this case on the standard of care applicable to nursing home conduct toward their residents, we decline to lower the standard in Rubio's circumstances as we find no indication that the Legislature intended to lower it.

## 2. Response to Concurrence and Dissent

In his concurrence, CHIEF JUSTICE JEFFERSON disagrees that Rubio's allegations fall within the MLIIA's definition of health care. At 857. CHIEF JUSTICE JEFFERSON would characterize some of Rubio's claims—specifically, Rubio's allegations concerning Diversicare's failure to protect her from sexual assault, failure to implement adequate safety precautions, and failure to establish appropriate safety and staffing procedures—as premises liability claims or "claims for 'inadequate security' " that are " 'independent of any medical diagnosis, treatment, or care.' " *Id.* (quoting *Robinson v. W. Fla. Reg'l Med. Ctr.*, 675 So.2d 226, 228 (Fla.Dist.Ct.App.1996)). To the contrary, Rubio's claims implicate more than inadequate security or negligent maintenance. Rubio is not complaining about an unlocked window that gave an intruder access to the facility or a rickety staircase that gave way under her weight. All of her claims arise from acts or omissions that are inseparable from the provision of health care. *See Walden,* 907 S.W.2d at 448. We do not distinguish Rubio's health care claims from premises liability claims "simply because the landowner is a health care provider" but because the gravamen of Rubio's complaint is the alleged failure of Diversicare to implement adequate policies to care for, supervise, and protect its residents who require special, medical care. At 855. The dissenting and concurring justices contend that Rubio alleged a common law claim for premises liability independent of her health care liability claim. Their position would open the door to splicing health care liability claims into a multitude of other causes of action with standards of care, damages, and procedures contrary to the Legislature's explicit requirements. It is well settled that such artful pleading and recasting of claims is not permitted. *See MacGregor Med. Assoc.,* 985 S.W.2d at 40; *Gormley,* 907 S.W.2d at 450; *Walden,* 907 S.W.2d at 448; *Sorokolit,* 889 S.W.2d at 242. There may be circumstances that give rise to premises liability claims in a healthcare setting that may not be properly classified as health care liability claims, but those circumstances are not present here.

Chief Justice Jefferson also takes issue with the Court's conclusion that specialized knowledge of health care is necessary to physically and psychologically evaluate an inpatient population and determine the types of precautions and staffing levels that are appropriate for use in a particular health care facility. *Id.* at 858. Instead, he would conclude, as does Rubio, that the occurrence of a patient assault establishes the health care facility's duty and breach of that duty without any specialized analysis of what treatments, policies, or procedures are appropriate to the circumstances and whether they were breached. We have explained at length the medical diagnosis, treatment, and care that nursing homes are required by law to provide to their residents. We recognize that the care will vary with the different physical, mental, and psychosocial conditions presented by the inpatients. The general public is hardly equipped to medically diagnose these inpatients and treat their

ailments and infirmities, or determine how to protect the patient population.

### 3. Safety

We also conclude that Rubio's claims may be characterized as departures from accepted standards of safety. Former Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(4). Because the statute does not define safety, we apply its meaning as consistent with the common law. *Id.* at § 1.03(b). The commonly understood meaning of safety is the condition of being "untouched by danger; not exposed to danger; secure from danger, harm or loss." Black's Law Dictionary 1336 (6th ed.1990). Because the supervision of Rubio and the patient who assaulted her are inseparable from the accepted standards of safety applicable to the nursing home in this case, Rubio's claims are MLIIA claims under the safety element of the statute. *See Walden,* 907 S.W.2d at 448. Certainly, the Legislature's inclusion within the scope of the MLIIA of claims based on breaches of accepted standards of "safety" expands the scope of the statute beyond what it would be if it only covered medical and health care. Professional supervision, monitoring, and protection of the patient population necessarily implicate the accepted standards of safety under the MLI-IA, just as those duties in this case are included in the term health care.

### IV. Conclusion

Rubio claims that Diversicare failed to provide adequate supervision and nursing services to meet her fundamental needs and to protect her. The Legislature broadly defined health care liability claim in the MLIIA, and the definition includes her claims. *See* former Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(4). Accordingly, the statute of limitations is not tolled by section 16.001(b) of Texas Civil Practice and Remedies Code. Because Rubio filed suit in 1999 and the sexual assault occurred in 1995, Rubio's claims are barred by the two-year statute of limitations in the MLI-IA. We reverse the decision of the court of appeals and render judgment for Diversicare.

Chief Justice JEFFERSON filed an opinion concurring in part, dissenting in part, and concurring in the judgment.

Justice O'NEILL filed a dissenting opinion, in which Justice BRISTER and Justice GREEN joined.

Chief Justice JEFFERSON, concurring in part, dissenting in part, and concurring in the judgment.

I join in the Court's holding that Rubio's allegations based on the incidents of sexual assault constitute a "claimed departure from accepted standards of safety," and are therefore barred by the MLIIA's two-year statute of limitations. At 847. I do not, however, agree with the Court's conclusion that Rubio has presented a cause of action for departures from accepted standards of health care. The principal allegation in Rubio's complaint—that Diversicare failed to protect her from a known sexual predator—raises a premises liability claim which falls under the statute's "safety" component.

### I

### Medical Malpractice versus Ordinary Negligence

In a health care setting, the line between medical malpractice and ordinary negligence is easily blurred. As many courts have observed, "the distinction between medical malpractice and negligence is a subtle one, for medical malpractice is but a species of negligence and 'no rigid analytical line separates the two.'" *Weiner v. Lenox Hill Hosp.,* 88 N.Y.2d 784, 650

N.Y.S.2d 629, 673 N.E.2d 914, 916 (1996) (citation omitted), *quoted in Gunter v. Lab. Corp. of America,* 121 S.W.3d 636, 639 (Tenn.2003). Thus, determining the appropriate standard of care to apply to a patient's claim against a health care provider is seldom an easy task. *See Gold v. Greenwich Hosp. Ass'n,* 262 Conn. 248, 811 A.2d 1266, 1270 (2002).

In this case, the Court parses medical malpractice from ordinary negligence in a claim involving the alleged sexual assault of a nursing home patient. *See* at 853. Based on this analysis, the Court concludes that all of Rubio's claims are health care liability claims under the MLIIA. *Id.* at 853. But every Texas court of appeals to consider the issue has held otherwise. In addition to the court of appeals in the present case, three other courts have determined that the MLIIA does not apply to claims arising out of a patient's assault of another patient because such claims were not based on medical or health care services. *See Healthcare Ctrs. of Tex., Inc. v. Rigby,* 97 S.W.3d 610, 621–22 (Tex. App.-Houston [14th Dist.] 2002, pet. denied); *Zuniga v. Healthcare San Antonio,* 94 S.W.3d 778, 782–83 (Tex.App.-San Antonio 2002, no pet.); *Bush v. Green Oaks Operator, Inc.,* 39 S.W.3d 669, 673 (Tex. App.-Dallas 2001, no pet.).

In *Rigby,* the court held that a claim against a nursing home arising out of a patient's assault of another patient was not a health care liability claim. 97 S.W.3d at 622. In that case, a male nursing home resident, who had a known history of sexually violent behavior, attempted to sexually assault a female resident. *Id.* at 614–17. The court concluded that the claim involved "simple negligence in failing to take adequate safety measures to protect [the nursing home] residents from a known sexual deviant." *Id.* at 622; *see also id.* at 628 (Brister, C.J., concurring).

Likewise, the *Zuniga* court held that the MLIIA did not apply to a claim involving a psychiatric hospital patient's allegations that she was sexually assaulted by another patient. 94 S.W.3d at 780, 783. The plaintiff in that case alleged that the hospital "was negligent in failing to: protect her from abuse, take [sic] reasonable efforts to prevent actions by another person that resulted in physical injury, make reasonable efforts to prevent sexual contact, and provide her a safe environment." *Id.* at 782. The hospital argued that Zuniga's claims asserted, in essence, a failure to "provide a therapeutic environment that would keep Zuniga safe from herself and others." *Id.* The court rejected the hospital's argument noting: "While we agree that preventing a patient from harming herself or others is part of the treatment provided to an involuntarily committed psychiatric patient, the allegation of injury here was not Zuniga's harm to herself or to others. Instead, the allegation is another patient's assault of her while on [the hospital's] premises." *Id.*

Finally, in *Bush,* the court held that a patient's claim against a hospital arising from an alleged attack by a fellow patient with a known propensity for violent behavior was not a health care liability claim under the MLIIA. 39 S.W.3d at 670, 672. Bush, the plaintiff patient, claimed that the hospital "was negligent either in failing to warn her of the known danger or in failing to maintain the premises in a safe manner or both." *Id.* at 670–71. The hospital argued that Bush's claim was "fundamentally a claim for negligent diagnosis and lack of proper treatment with respect to her assailant" and thus was subject to the MLIIA. *Id.* at 672. The court disagreed, noting: "Although [the hospital's] alleged failure to provide Bush with a reasonably safe environment may ultimately involve a determination of whether the hospital

breached a standard of care with respect to [the assailant], Bush's claim, as pleaded, is not for negligence in her medical treatment." *Id.*

Indeed, many courts analyzing similar claims under comparable statutes have held that claims involving inpatient assault sound in ordinary negligence rather than medical malpractice. *See, e.g., Andrea N. v. Laurelwood Convalescent Hosp.,* 13 Cal. App.4th 1492, 18 Cal.App.4th 1698, 16 Cal. Rptr.2d 894, 903 (Cal.Ct.App.1993), *review granted,* 19 Cal.Rptr.2d 519, 851 P.2d 801, 802 (Cal.1993), *and review dismissed,* 27 Cal.Rptr.2d 1, 865 P.2d 632 (Cal.1994); *Lauria v. West Rock Health, Inc.,* No. CV03082278, 2004 WL 201939, at *2 (Conn.Super.Ct. Jan.13, 2004); *Delaney v. Newington Children's Hosp.,* No. CV–93–0524063, 1994 WL 228322, at *2–3 (Conn.Super.Ct. May 9, 1994); *Robinson v. West Fla. Reg'l Med. Ctr.,* 675 So.2d 226, 228 (Fla.Dist.Ct.App.1996); *Hicks v. Baptist Hosp., Inc.,* 676 So.2d 1019, 1019 (Fla. Dist.Ct.App.1996); *Palm Springs Gen. Hosp., Inc. v. Perez,* 661 So.2d 1222, 1223 (Fla.Dist.Ct.App.1995); *Klingman v. Green,* 616 So.2d 762, 763–64 (La.Ct.App. 1993); *Reaux v. Our Lady of Lourdes Hosp.,* 492 So.2d 233, 234–35 (La.Ct.App. 1986); *Afamefune v. Suburban Hosp., Inc.,* 385 Md. 677, 870 A.2d 592, 602–03 (2005); *Borrillo v. Beekman Downtown Hosp.,* 146 A.D.2d 734, 537 N.Y.S.2d 219, 220–21 (N.Y.App.Div.1989); *Sumblin v. Craven County Hosp. Corp.,* 86 N.C.App. 358, 357 S.E.2d 376, 377–79 (1987); *Burns v. Forsyth County Hosp. Auth., Inc.,* 81 N.C.App. 556, 344 S.E.2d 839, 846 (1986). *But see Dorris v. Detroit Osteopathic Hosp. Corp.,* 460 Mich. 26, 594 N.W.2d 455, 466–67 (1999); *Smith v. Four Corners*

*Mental Health Ctr., Inc.,* 70 P.3d 904, 914 (Utah 2003).

## A

### Premises Liability

In applying the MLIIA to this case, the Court characterizes Rubio's claims as inseparable from the health care related issues of inadequate supervision and nursing services. At 847. But Rubio's complaint, at its core, is that the nursing home did not protect her from repeated acts of sexual abuse and assault committed by a known sexual predator.[1] Contrary to the Court's interpretation, the sexual assault allegations are not connected to or dependent on the claims for inadequate monitoring and supervision. Rather, construed liberally, the sexual assault allegations are claims for "inadequate security, independent of any medical diagnosis, treatment, or care." *Robinson,* 675 So.2d at 228. In other words, Rubio's complaint, on its face, asserts a cause of action for ordinary premises liability.

According to the Court, a nursing home's duty to its patients cannot be compared to the duty a regular premises owner would owe to a resident because the residents of a nursing home are there "for care and treatment, not merely for shelter." At 851. Rubio's assault allegations, however, are not tied to the nursing home's provision of care and treatment. Several courts have recognized that, in addition to the heightened standard of care that accompanies the rendering of professional services, health care facilities also owe their patients a duty to exercise ordinary care in the maintenance of their premises. *See Charrin v. Methodist*

---

1. Specifically, Rubio alleges that Diversicare failed to: (1) "implement safety precautions to protect the safety of its residents"; (2) protect her from "repeated acts of sexual abuse and assault by others including other residents"; and (3) "establish appropriate corporate safety, training and staffing policies."

*Hosp.,* 432 S.W.2d 572, 574–75 (Tex.Civ. App.-Houston [1st Dist.] 1968, no writ) ("A patient accepted by a hospital enjoys the status of an invitee or business visitor entitled to the exercise of ordinary care by the hospital to keep its premises in reasonably safe condition for the expected use. Thus, the hospital as occupier of the premises has a duty to keep them in a reasonably safe condition for its invitees, to warn or protect its invitees from any dangers of which it knows or should know in the exercise of ordinary care.") (citation omitted); *Burns,* 344 S.E.2d at 846 ("[T]he hospital has a duty to exercise ordinary care to keep the premises in a reasonably safe condition so as not to expose the patient unnecessarily to danger.").

A tenant's claim against a landowner for failing to provide adequate security against foreseeable criminal conduct is typically a premises liability claim. *See Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749, 753 (Tex.1998). I do not see why the same claim should be treated differently in this case simply because the landowner is a health care provider. *See Sumblin,* 357 S.E.2d at 378–79 (recognizing that "a hospital, much like the proprietor of any public facility, owes a duty to its invitees to protect the patient against foreseeable assaults by another patient"); *Burns,* 344 S.E.2d at 846–47 ("[T]he proprietor of a restaurant owes a duty to protect the invitee against the foreseeable assaults by another invitee.... We find the hospital similarly owes a duty to protect the patient against foreseeable assaults by another patient.").

Although providing care and treatment to patients may be a nursing home's main function, not every duty owed to a nursing home resident stems from medical treatment or health care. A nursing home serves dual roles as both a health care provider and residential facility. *See Richard v. La. Extended Care Ctrs., Inc.,* 835 So.2d 460, 468 (La.2003) (noting that "[i]n the case of a nursing home, the nursing home resident is not always receiving medical care or treatment" and thus not all claims against a nursing home will involve medical treatment). Here, Rubio alleges that Diversicare failed to furnish her with "a reasonably safe premises" and failed "to exercise ordinary care to protect her from a sexual predator." These allegations stem from the nursing home's duty as a premises owner rather than as a health care provider and thus are classic premises liability claims.

## B

### Expert Testimony

Furthermore, I do not agree that, as a matter of law, establishing the standard of care necessary to prevent inpatient assaults requires medical expertise.[2] Numerous courts, both in Texas and elsewhere, have determined that specialized medical knowledge is not necessary to establish a breach of duty for claims involving patient assault. *See, e.g., Sisters of Charity of the Incarnate Word, Houston, Tex. v. Gobert,* 992 S.W.2d 25, 30 (Tex. App.-Houston [1st Dist.] 1997, no pet.) (considering patient's allegation that she was sexually assaulted by another patient and concluding that "[a] determination that [the hospital] breached the standard of care by its negligent failure to monitor the patients' rooms, and the comings and goings of patients into and out of each

---

2. The MLIIA's expert report requirement is procedural. *Murphy v. Russell,* 167 S.W.3d 835, 838 (Tex.2005)(per curiam) ("A claim may be a health care liability claim to which the damage caps and expert report requirements are applicable and yet not require expert testimony to prevail at trial.").

other's rooms is not one requiring special training, insight, or proof"); *Juhnke v. Evangelical Lutheran Good Samaritan Soc'y*, 6 Kan.App.2d 744, 634 P.2d 1132, 1136 (1981) (finding "that the trier of fact would have been fully capable of determining, without the aid of expert testimony, whether the defendant nursing home breached its duty to exercise reasonable care to avoid injury to [a] patient" assaulted by a fellow patient); *Virginia S. v. Salt Lake Care Ctr.*, 741 P.2d 969, 972 (Utah Ct.App.1987) ("In the present case, where a mentally and physically incapacitated seventeen-year-old girl was raped while under the care and custody of the defendant nursing home, there are no medical technicalities involved that call for expert testimony to determine whether the nursing home breached its standard of care."); *see also Rigby*, 97 S.W.3d at 628 (Brister, C.J., concurring) ("I agree with the Court this is not a medical malpractice case, as the propriety of failing to supervise a sexual deviant in a nursing home is within the common knowledge of laymen.").

In a comparable case, the Michigan Supreme Court recently held that expert testimony was not required to bring a claim against a nursing home when the allegations involve a nursing home's failure to protect a patient from a known danger, stating:

> This claim sounds in ordinary negligence. No expert testimony is necessary to determine whether˙ defendant's employees should have taken *some* sort of corrective action to prevent future harm after learning of the hazard. The fact-finder can rely on common knowledge and experience in determining whether defendant ought to have made an attempt to reduce a known risk of imminent harm to one of its charges.

*Bryant v. Oakpointe Villa Nursing Ctr.*, 471 Mich. 411, 684 N.W.2d 864, 875 (2004)

(emphasis in original). The same principle applies here. The Court posits that "[i]t is not within the common knowledge of the general public to determine the ability of patients in weakened conditions to protect themselves" or to determine the means used to restrain a "potential attacker." At 851. Those statements would be true if the jury were asked to assess the patient's (or her attacker's) mental or physical condition. But no such assessment is necessary under the facts alleged here. In her complaint, Rubio alleges that the sexual abuse she endured was "repetitious and recurring," and that Diversicare was aware of the attacks and was therefore "in the unique position to predict a repeat of such behavior by the predator and to take preventative measures to avert any reoccurrence." A nursing home's obligation to secure its patients against multiple attacks by a known sexual predator is well within the purview of common knowledge.

## II

### The MLIIA

Although Rubio's claims involve premises liability rather than medical malpractice, the distinction is not outcome determinative here. The Legislature has captured both concepts under the broad rubric of "health care liability claim," as defined by the MLIIA:

> "Health care liability claim" means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care *or safety* which proximately results in injury to or death of the patient, whether the patient's claim or cause of action sounds in tort or contract.

Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.03(a)(4), 1977 Tex. Gen. Laws 2039, 2041 (former TEX.REV.CIV. STAT. art.

4590i, § 1.03(a)(4)), *repealed and codified as amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 10.01, 10.09, 2003 Tex. Gen. Laws 847, 864, 884 (current version at TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13)). Here, there can be little doubt that Rubio's complaint involves a "claimed departure from accepted standards of safety."[3] *Id.* Thus, I agree that Rubio's claims fall within the statute.

Both JUSTICE O'NEILL and Rubio favor a narrower interpretation of safety advanced by several of the courts of appeals under which "safety" is read to mean safety as it relates to the provision of health care. At 866 (O'Neill, J., dissenting); *see Rogers v. Crossroads Nursing Serv., Inc.,* 13 S.W.3d 417, 418–19 (Tex.App.-Corpus Christi 1999, no pet.) (opining that "[t]he word 'safety' cannot be read in isolation, and the phrase 'accepted standard of ... safety' must be read in context to mean 'accepted standard of safety *within the health care industry.'* ") (italics in original), *cited with approval in Bush,* 39 S.W.3d at 673, and *Rigby,* 97 S.W.3d at 621; *see also Zuniga,* 94 S.W.3d at 783 (quoting *Rigby,* 97 S.W.3d at 620–21). While this construction of "safety" is defensible as a matter of policy, it is not faithful to the statute's plain text.

As we have often explained:

Courts must take statutes as they find them. More than that, they should be willing to take them as they find them. They should search out carefully the intendment of a statute, giving full effect to all of its terms. But they must find its intent in its language, and not elsewhere. They are not the law-making body. They are not responsible for omissions in legislation. They are responsible for a true and fair interpreta-

tion of the written law. It must be an interpretation which expresses only the will of the makers of the law, not forced nor strained, but simply such as the words of the law in their plain sense fairly sanction and will clearly sustain. *Simmons v. Arnim,* 110 Tex. 309, 220 S.W. 66, 70 (Tex.1920), *quoted in St. Luke's Episcopal Hosp. v. Agbor,* 952 S.W.2d 503, 505 (Tex.1997), *RepublicBank Dallas, N.A. v. Interkal, Inc.,* 691 S.W.2d 605, 607 (Tex. 1985), and *Tex. Highway Comm'n v. El Paso Bldg. & Constr. Trades Council,* 149 Tex. 457, 234 S.W.2d 857, 863 (1950). Straightforward statutory construction ensures that ordinary citizens are able "to rely on the plain language of a statute to mean what it says." *Fitzgerald v. Advanced Spine Fixation Sys.,* 996 S.W.2d 864, 866 (Tex.1999). But when courts "abandon the plain meaning of words, statutory construction rests upon insecure and obscure foundations at best." *State v. Jackson,* 376 S.W.2d 341, 346 (Tex.1964) (quoting *State Bd. of Ins. v. Betts,* 158 Tex. 612, 315 S.W.2d 279, 281(1958)).

The MLIIA explicitly provides that "any legal term or word of art used in this part, not otherwise defined in this part, shall have such meaning as is consistent with the common law." Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.03(b), 1977 Tex. Gen. Laws 2039, 2041 (former TEX. REV.CIV. STAT. art. 4590i, § 1.03(b)), *repealed and codified as amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 10.01, 10.09, 2003 Tex. Gen. Laws 847, 866, 884 (current version at TEX. CIV. PRAC. & REM.CODE § 74.001(b)). Because the statute does not define "safety," we must assign it its common meaning. *Id.* Safety is commonly understood to mean protection from danger. *See* BLACK'S LAW DICTIO-

---

3. Though many states have statutes regulating medical malpractice claims, the MLIIA is unique in that it apparently is the only statute of its kind that by definition extends to claims involving "safety."

NARY 1362 (8th ed.2004) (defining "safe" as "[n]ot exposed to danger; not causing danger"). The specific source of that danger, be it a structural defect, criminal assault, or careless act, is without limitation. While it may be logical to read into the statute a requirement that a safety related claim also involve health care, there is nothing implicit in safety's plain meaning nor explicit in the MLIIA's language that allows us to impose such a restriction.[4] Accordingly, to give full effect to the MLIIA's language, we must recognize that a health care liability claim includes a complaint that a patient was inadequately protected from the danger of sexual assault.

## III

### Conclusion

In defining health care liability claims as it did, the Legislature created a statute with a broad scope. Complaints about the breadth of this statute should be directed to the Legislature, not to this Court, for the courts must "take statutes as they find them." *Simmons*, 220 S.W. at 70. Accordingly, I concur in part III(B)(3) of the Court's opinion and concur in the judgment.

Justice O'NEILL, joined by Justice BRISTER and Justice GREEN, dissenting.

The facts of this case are not in dispute: in 1995, an elderly Alzheimer's patient was sexually assaulted by another patient while both were under the full-time care of a nursing home. The only question before us is whether the injured patient's claim against the nursing home is more properly characterized as an ordinary negligence claim or a health care liability claim. In this case, the pleadings themselves did not allege facts establishing which standard should govern the case. During trial court proceedings, plaintiff's counsel suggested that the claim derived, at least in part, from the nursing home's alleged failure to properly staff the facility. To the extent that it does, I agree that the statute governing health care liability claims applies. I respectfully dissent, however, because the petition, liberally construed, alleges a broader claim for premises liability.

### I

The Legislature enacted the Medical Liability and Insurance ·Improvement Act (MLIIA) in order to reduce the cost of

---

4. As JUSTICE O'NEILL notes in her dissent, the Legislature recently amended the definition of a "health care liability claim" as follows:

a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety *or professional or administrative services directly related to health care,* which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13) (emphasis added). Thus, in addition to claims involving "accepted standards of medical care, or health care, or safety," the statute now also applies to claims arising from "professional or administrative services directly

related to health care." *Id.* It is clear under the revised statute that claims for "professional or administrative services" must be "directly related to health care"; however, there is no indication that claims involving "safety" must also relate to health care. If, as JUSTICE O'NEILL intimates, the phrase "directly related to health care," applies to the entire preceding passage (i.e., "accepted standards of medical care, or health care, or safety"), then under the amended statute a "health care liability claim" includes a "claimed departure from accepted standards of ... health care ... directly related to health care." *Id.* To avoid this redundancy, I read the amended statute as requiring only that claims for "professional or administrative services" be "directly related to health care."

medical malpractice insurance and thereby increase patients' access to health care. Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02(b)(1)-(5), 1977 Tex. Gen. Laws 2039, 2040 (former TEX.REV.CIV. STAT. art. 4590i, § 1.02(b)(1)-(5)), *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. To accomplish these goals, the MLIIA mandates that plaintiffs follow certain procedures when bringing health care liability claims against physicians or other health care providers—for example, claimants must bring suit within two years, and they must file an expert report substantiating their claims within 180 days of filing suit. *Id.* §§ 10.01, 13.01. The MLIIA also contains limitations on the amount of damages recoverable. *Id.* § 11.02.

By its terms, the MLIIA imposes these restrictions on any "cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety" that causes injury to a patient. *Id.* § 1.03(a)(4). We have recognized that the heightened requirements applied to health care liability claims may sometimes create an incentive for litigants to re-cast a health care liability claim as another type of claim, and we have therefore held that courts must look beyond the pleadings to examine the nature of the underlying action. *MacGregor Med. Ass'n v. Campbell,* 985 S.W.2d 38, 40 (Tex.1998).

Analyzing the underlying action is not always an easy task, but it is one that courts must undertake with great care; the Legislature's purpose in enacting the MLIIA may be thwarted if courts construe the MLIIA's definition of "health care liability claim" either too broadly or too narrowly. An overly narrow interpretation would render the statute ineffective because it would exclude too many suits from

the statute's reach and thus hinder the Legislature's goal of reducing malpractice insurance rates.

Somewhat counter intuitively, however, an overly broad interpretation could have the same result. Health care providers, like other insured professionals, generally carry two insurance policies: a general liability policy that covers ordinary negligence, and a malpractice policy "to cover obligations arising from the rendering of professional services." *Cochran v. B.J. Servs. Co. USA,* 302 F.3d 499, 502 (5th Cir.2002); *see also Utica Nat'l Ins. Co. v. Am. Indem. Co.,* 141 S.W.3d 198, 201 *(Tex.2004).* If a court determines that a plaintiff's pleadings allege a breach of the applicable standard of care for health care providers, then the defense and indemnification expenses will most likely fall under the malpractice policy rather than the general insurance policy. *See* TEX. INS.CODE art. 21.49–3, § 2(1)(defining "medical liability insurance" as applying to claims "arising out of the death or injury of any person as the result of negligence in rendering or the failure to render professional service by a health care provider"). Insurers therefore face their own litigation incentives: malpractice insurers benefit when a claim is characterized as ordinary negligence, and general-liability insurers benefit when a claim is characterized as a health care liability claim. *See Utica Nat'l Ins. Co.,* 141 S.W.3d at 201 (addressing a claim in which the general-liability insurer asserted that a patient's injuries arose from the "rendering or failure to render [a] professional service"; the patient contracted Hepatitis C from an injection of contaminated drugs it failed to adequately secure); *see also Harris v. Sternberg,* 819 So.2d 1134, 1137 (La.Ct.App.2002) (addressing a claim in which the malpractice insurer asserted that the patient's injuries arose from ordinary negligence; the patient slipped and fell from the doctor's

scale). Consequently, the adoption of an overly broad interpretation of "health care liability claim" could also hinder the Legislature's goal of ensuring that medical malpractice insurance is available at a reasonable cost: if courts sweep even ordinary negligence claims into the ambit of the MLIIA, then malpractice insurers may end up covering more of those claims. Malpractice insurance rates would then continue to rise as those insurance policies are required to cover claims that were not contemplated under the insurance contracts.

This Court has recognized the importance of correctly classifying these claims and has developed a framework for analysis in these cases. If a claim arises from an action that is an "inseparable part of the rendition of medical services," then the MLIIA applies to the claim. *Walden v. Jeffery*, 907 S.W.2d 446, 448 (Tex.1995). Thus, if a plaintiff, in order to "successfully prove th[e] claim, ... must prove a breach of the applicable standard of care for health care providers," then the action arises under the MLIIA—regardless of how the litigants choose to characterize it. *MacGregor Med. Ass'n*, 985 S.W.2d at 40–41 (holding that a claim that a health care provider failed to properly diagnose and treat a patient was a health care liability claim even though the plaintiff attempted to characterize it as a DTPA claim arising from the provider's alleged misrepresentation that it would provide "qualified personnel and resources," and "the best health services possible"). However, if the claim is not based upon such a breach, then it is not a health care liability claim. *Sorokolit v. Rhodes*, 889 S.W.2d 239, 242 (Tex.1994) (holding that a claim that a physician "knowingly breached his express warranty of a particular result" was not a health care liability claim because it did not require "a determination of whether a physician failed to meet the standard of medical care").

Courts in other states have applied a similar framework. First, they have tended to construe state malpractice statutes as applying only to breaches of the professional standard of care. *See, e.g., Dorris v. Detroit Osteopathic Hosp. Corp.*, 460 Mich. 26, 594 N.W.2d 455, 465 (1999) (holding that Michigan's medical malpractice statute would apply to a claim raising "questions of professional medical management"); *Woodard v. Krans*, 234 Ill.App.3d 690, 175 Ill.Dec. 546, 600 N.E.2d 477, 488 (1992) (holding that "[w]here determining the standard of care requires applying distinctively medical knowledge or principles, however basic, the plaintiff must comply with [Illinois's malpractice statute]"). Second, they have held that claims not directly tied to the provision of health care should be governed by an ordinary negligence standard. *See Cannon v. McKen*, 296 Md. 27, 459 A.2d 196, 201 (1983) ("Those claims for damages arising from a professional's failure to exercise due care in non-professional situations such as premises liability, slander, assault, etc., were not intended to be covered under [Maryland's malpractice act] and should proceed in the usual tort claim manner."); *see also Dent v. Memorial Hosp.*, 270 Ga. 316, 509 S.E.2d 908, 910 (1998) (holding that negligence in the decision of "[w]hether to use certain equipment at all, what type of equipment to use, and whether certain equipment should be available in a specific case" would amount to malpractice, but that "the failure to operate equipment correctly or in accordance with a doctor's instructions or to keep certain equipment on hand is only ordinary, not professional, negligence").

In this case, Ms. Rubio's pleadings do not clearly establish whether all of her claims pertain to breach of the "applicable

standard of care for health care providers," *MacGregor Med. Ass'n*, 985 S.W.2d at 41, or whether some of the claims assert a breach only of an ordinary standard of care. Several of her allegations could pertain either to general negligence or to professional malpractice; for example, she alleges that Diversicare failed to "protect Ms. Rubio from repeated acts of sexual abuse and assault by others. . . ." Ms. Rubio's pleadings do not specify what particular acts or omissions led to the assaults. Sadly, it has been recognized that "nursing-home residents and hospital patients have been the victims of assault not only by employees but also by others, even persons wandering in off the street." *Regions Bank & Trust v. Stone County Skilled Nursing Facility, Inc.*, 345 Ark. 555, 49 S.W.3d 107, 113 (2001). Consequently, an assault in a residential care facility may arise from any number of negligent acts: failure to secure the premises, failure to adequately screen personnel, failure to adequately restrain mentally impaired patients, or failure to provide adequate nursing services. *See, e.g., id.; see also Reaux v. Our Lady of Lourdes Hosp.*, 492 So.2d 233 (La.Ct.App.1986), *writ denied*, 496 So.2d 333 (La.1986) (holding that allegations of assault, rape, and battery by a hospital intruder did not fall within Louisiana's Medical Malpractice Act); ERIC M. CARLSON, LONG-TERM CARE ADVOCACY § 10.09 (2002). Thus, an allegation that a nursing home failed to protect a patient from assault can sound either in medical malpractice or in ordinary negligence.

### A

To the extent that Ms. Rubio's causes of action depend on an underlying claim of understaffing, I agree that they are governed by the MLIIA. Ms. Rubio's attorneys suggested in the trial court that her claims related to the nursing home's staff-ing procedures, stating that the "underlying cause" of the assault was that the nursing home was "dangerously understaffed." In this Court, the attorneys emphasized at oral argument that the sexual-assault claim was "inextricably intertwined with what's necessary for an Alzheimer patient-to-staff ratio" and agreed that their legal argument was based on the premise that "there is no medical judgment in determining how much staff is needed for those patients more in need of supervision."

This premise, however, is incorrect; in fact, a nursing home is required by law to use medical judgment in its staffing decisions. 40 TEX. ADMIN. CODE § 19.1001. State regulations require that a nursing home offer "sufficient staff to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care." *Id.* The "resident assessment" requires the facility to analyze, among other things, the resident's "physical functioning and structural problems," "psychosocial well-being," and "disease diagnoses and health conditions." *Id.* § 19.801. The "plan of care" must be prepared by "an interdisciplinary team that includes the attending physician, a registered nurse with responsibility for the resident, and other appropriate staff" and must include "measurable short-term and long-term objectives and timetables to meet a resident's medical, nursing, and mental and psychosocial needs that are identified in the comprehensive assessment." *Id.* § 19.802. Because a nursing home is required to consider the physical and mental-health conditions of each of its residents in determining its staffing needs, these decisions simply cannot be made without employing medical judgment.

## B

Not all of the claims pleaded by Ms. Rubio necessarily related to the allegations of understaffing, however. Instead, her pleading also asserted that the facility failed to use ordinary care to protect her from a known danger; specifically, she pleaded that "[d]efendants were well aware" of the alleged assailant's sexual-assault history and that the facility failed "to take preventive measures to avert any reoccurrence." This allegation, broadly construed, asserts a premises liability claim; it does not necessarily require the exercise of medical judgment, but could instead be read to support a claim that the facility failed to use ordinary care to secure the premises.

Ms. Rubio's premises liability claim is similar to the claims in several other cases decided by our courts of appeals. *See Healthcare Ctrs. of Tex., Inc. v. Rigby*, 97 S.W.3d 610, 616–17 (Tex.App.-Houston [14th Dist.] 2002, pet. denied); *Zuniga v. Healthcare San Antonio, Inc.*, 94 S.W.3d 778, 780 (Tex.App.-San Antonio 2002, no pet.); *Bush v. Green Oaks Operator, Inc.*, 39 S.W.3d 669, 670 (Tex.App.-Dallas 2001, no pet.); *Sisters of Charity of the Incarnate Word, Houston, Tex. v. Gobert*, 992 S.W.2d 25, 27 (Tex.App.-Houston [1st Dist.] 1997, no pet.). The Court today overrules these cases "to the extent they hold that the patients' claims for assault by other patients are not health care liability claims." At 853. I would not overrule these cases; each of the plaintiffs in these cases assert claims that extend beyond claims for "inadequate care and supervision," just as Ms. Rubio did in this case. In *Rigby*, for example, there was evidence that a nursing home administrator induced a nursing home to accept a sexually violent patient by misrepresenting the scope of the patient's prior acts. *Rigby*, 97 S.W.3d at 615. Deliberate misrepresentation does not involve medical judgment. Further-

more, there was evidence that the facility in that case knew the attacker had a history of sexual violence and yet failed to take even ordinary safety precautions; in that case, I believe the court of appeals correctly concluded that the suit was based on "simple negligence in failing to take adequate safety measures to protect its residents from a known sexual deviant." *Id.* at 622.

Nor would I overrule the other cases. In *Bush*, a patient was assaulted by another patient while under the care of a hospital facility; the plaintiff claimed that the facility failed to warn her of a known danger. *Bush*, 39 S.W.3d at 670–71. I would not hold that a duty to warn of a known danger on the premises depends on medical judgment or skill. In *Zuniga*, a case with similar facts, the plaintiff also brought a premises liability claim that was not limited to questions relating to proper treatment but instead asserted that the facility "did not provide her a safe environment." *Zuniga*, 94 S.W.3d at 782. Finally, in *Gobert*, the court neither mentioned the MLIIA nor considered whether it would apply to the case. *Gobert*, 992 S.W.2d 25.

Because the pleadings in this case did not allege facts establishing whether Ms. Rubio's claims resulted from an alleged failure to provide adequate patient care or resulted from an alleged failure to secure the premises, the pleadings did not establish whether the claim was a health care liability claim or whether it sounded in ordinary negligence. When a plaintiff's pleading does not give "fair and adequate notice of the facts upon which the pleader bases his claim," then the defendant may file special exceptions to obtain a more definite statement of the plaintiff's claim. *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982). Here, however, the nursing home

did not file special exceptions. We have recognized that in the absence of such special exceptions, the petition must be "construed liberally in favor of the pleader" and that the court "should uphold the petition as to a cause of action that may be reasonably inferred from what is specifically stated...." *Boyles v. Kerr,* 855 S.W.2d 593, 601 (Tex.1993). Consequently, I would hold that the petition, construed liberally in favor of Ms. Rubio, stated a cause of action for premises liability. *See Charrin v. Methodist Hospital,* 432 S.W.2d 572, 574 (Tex.Civ.App.-Houston [1st Dist.] 1968, no writ) ("A patient accepted by a hospital enjoys the status of an invitee or business visitor entitled to the exercise of ordinary care by the hospital to keep its premises in reasonably safe condition for the expected use.").

## II

I also note my disagreement with the suggestion in CHIEF JUSTICE JEFFERSON's concurrence that a "safety" claim under the MLIIA need not be related to the provision of health care. Instead, I agree with the Court that the MLIIA encompasses claims for a "departure from an accepted standard of ... safety" when those claims are directly related to the provision of health care, including claims based on "professional supervision, monitoring, and protection of ... patient[s]." At 855.

The statute in effect at the time this case arose provided that claims "against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety" would be governed by the MLIIA. Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.03(a)(4), 1977 Tex. Gen. Laws 2039, 2041 (former TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(4)) (repealed 2003). The Legisla-

ture did not provide that the statute governs all claims against a health care provider or physician; instead, it limited the statute's scope to claims "for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety." *Id.*

Chief Justice Jefferson suggests that the term "safety" is broad enough to encompass a premises liability claim unrelated to the provision of health care. At 867. I disagree that the term can be read so broadly; instead, it must be read in the context of the MLIIA, which was enacted to address concerns about health care costs. TEX. GOV'T CODE § 311.011 (providing that "[w]ords and phrases shall be *read in context*" as well as "construed according to the rules of grammar and common usage") (emphasis added); *see also Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) (noting that it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme").

If we follow the dictates of the Code Construction Act and read the term "safety" in the context of the statute as a whole, then the natural conclusion is that "safety" in this statute means safety *as it relates to health care.* This is the conclusion that has been reached by each of the courts of appeals considering the issue; these courts have then analyzed whether professional judgment is required to determine the proper standard of safety or whether only a general duty of care is implicated. *See Marks v. St. Luke's Episcopal Hosp.,* 177 S.W.3d 255, 258 (Tex.App. Houston [1st Dist.] 2005, pet. filed) (noting that, in a case where a patient was injured by a broken hospital bed, "[t]he underlying nature of his allegations is of an unsafe con-

dition created by an item of furniture," and concluding that "[s]uch a complaint relates to premises liability, not health care liability, and is governed by the standard of ordinary negligence"); *Bush*, 39 S.W.3d at 673 ("Although the Act includes breaches of accepted standards of safety within the definition of a health care liability claim, the term 'safety' cannot be read in isolation. The breach must be of an accepted standard of safety within the health care industry.") (citation omitted); *Rogers v. Crossroads Nursing Serv., Inc.*, 13 S.W.3d 417, 419 (Tex.App.-Corpus Christi 1999, no pet.) (noting that "[o]ne of the rules of statutory construction is to construe the entire Act, reading each part of it so that one part does not conflict with another and to harmonize its various provisions," and concluding that "the only reasonable interpretation is that a departure from accepted standards of safety means safety in the diagnosis, care or treatment").

The Legislature itself has recently indicated that it agrees with our appellate courts' consistent judicial interpretation of the word "safety" in this statute. When it recently amended the definition of "health care liability claim," the Legislature clarified that claims falling under the statute must relate to the actual provision of health care. TEX. CIV. PRAC. & REM.CODE § 74.001(a)(13). The statute now provides that all claims "for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services *directly related to health care*" are included in the definition of health care liability claim. *Id.* (emphasis added). Although I believe that the plain language of the former statute makes it clear that "safety" was intended to be related to health care, this amendment removes any doubt. *See Alexander v. Alexandria*, 5 Cranch 1, 9 U.S. 1, 7–8, 3 L.Ed. 19 (1809) (concluding that the subse-

quent amendments of a legislative body may "show the sense in which the legislature employed doubtful phrases previously used," and that courts should accept this "legislative sense of its own language" as "a direction to courts in expounding the provisions of the law"); *see also Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381–82, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) (noting that a consistent statutory interpretation should be given great weight when a legislative body has not merely silently acquiesced to that interpretation, but has actually "ratified it with positive legislation"). The Legislature has now enacted positive legislation ratifying the courts of appeals' construction of the term "safety," and I believe we should interpret the term in accordance with this construction.

### III

I agree that the MLIIA would govern a claim that the nursing home failed to properly staff the facility. Because a nursing home is required to consider the physical and mental-health conditions of each of its residents in determining its staffing needs, staffing decisions cannot be made without employing medical judgment. Similarly, any safety claim arising from such staffing decisions would be "directly related to health care" and therefore also covered under the MLIIA. However, because the plaintiff's petition also included an allegation that the facility failed to use ordinary care to protect her from a known sexual offender, it alleged a broader premises liability claim. I therefore respectfully dissent.