NUMBER 13-08-00091-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


LEONARD TESORO, M.D., Appellant,


v.
 


EMMA ALVAREZ, Appellee.

 


On appeal from the County Court at Law No. 1 


of Hidalgo County, Texas.


 


O P I N I O N



Before Chief Justice Valdez and Justices Rodriguez and Benavides 


Opinion by Justice Rodriguez



 This is an interlocutory appeal from the trial court's denial of appellant Leonard
Tesoro, M.D.'s motion to dismiss appellee Emma Alvarez's claims on the basis that she
failed to comply with Texas Civil Practice and Remedies Code section 74.351. Tex. Civ.
Prac. & Rem. Code Ann. § 74.351 (Vernon Supp. 2008) (requiring that an expert report
must be filed timely in health care liability claim); see id. § 51.014(a)(9) (Vernon 2008)
(providing for an interlocutory appeal from an order denying relief sought by a motion under
section 74.351(b)). By four issues, Dr. Tesoro argues that Alvarez's claims against him are
health care liability claims and that, because Alvarez failed to provide an expert report, the
trial court erred in failing to dismiss her claim with prejudice. Because we conclude that
the nature of Alvarez's claim is not health care liability, we affirm.I. Background

 In 2006, Dean Joshua Blount, R.N., (1) a family nurse practitioner at the Texas
Southwest Medical Aesthetic Clinique (TSMAC), removed hair from Alvarez's legs using
a MeDioStar HC laser. (2) The laser allegedly burned Alvarez's legs and left scars. Alvarez
sued Blount for negligence claiming that Blount improperly used the laser. In her third
amended petition, Alvarez added Dr. Tesoro as a defendant and alleged that, as a general
partner of TSMAC, Dr. Tesoro was vicariously liable for the negligence of Blount, his agent. 
Alvarez did not file an expert report within 120 days of filing the claim and did not request
an extension to file a report.

 Dr. Tesoro moved to dismiss Alvarez's suit on the basis that her claim was a health
care liability claim and therefore subject to the requirements of chapter 74 of the civil
practice and remedies code, and that Alvarez had failed to file an expert report. 
Anticipating that Alvarez would contend that her cause of action was not a health care
liability claim, Dr. Tesoro urged that because he is a physician and because the
complained-of conduct is "health care," Alvarez's allegations constitute a health care
liability clam. In her response to Dr. Tesoro's motion, Alvarez set out that she went to
TSMAC to have unwanted hair on her legs removed with a laser; that Blount was the
person who used the laser to remove the hair; and that Dr. Tesoro had no personal
involvement in the use of a laser to remove her leg hair. Alvarez asserted, in her response,
that laser hair removal does not constitute health care, practicing medicine, or medical
care, and therefore her claim is not a health care liability claim that requires an expert
report.

 Following a hearing on Dr. Tesoro's motion to dismiss, the trial court denied the
motion. This interlocutory appeal ensued.

II. Standard of Review

 Generally, we review a trial court's denial of a motion to dismiss under an abuse of
discretion standard. Am. Transitional Care Cnts. of Tex., Inc. v. Palacios, 46 S.W.3d 874,
877 (Tex. 2001); Valley Baptist Med. Ctr. v. Stradley, 210 S.W.3d 770, 773 (Tex.
App.-Corpus Christi 2006, pet. denied). However, we review de novo the trial court's
denial of a motion to dismiss when it involves the determination of whether a claim is a
health care liability claim under chapter 74. Lee v. Booth, 235 S.W.3d 448, 451 (Tex.
App.-Dallas 2007, pet. denied); Stradley, 210 S.W.3d at 773; Gomez v. Matey, 55 S.W.3d
732, 735 & n.2 (Tex. App.-Corpus Christi 2001, no pet.).

III. Applicable Law

 Under section 74.351 of the Texas Civil Practice and Remedies Code, any person
who has brought a suit asserting a health care liability claim must, within 120 days of filing
the claim, provide an expert report for each physician or health care provider against whom
the claim is asserted. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). If the claimant does
not provide an expert report as required, the trial court must, upon motion by the
defendant, dismiss the claim with prejudice. Id. § 74.351(b). Expert report requirements
of section 74.351(b) apply to a claim, regardless of whether it is a tort claim, when that
claim comes within the statutory three-part definition of a "health care liability claim." Id.

 Chapter 74 defines a "health care liability claim" as,


 a cause of action [1] against a health care provider or physician [2] for
treatment, lack of treatment or other claimed departure from an accepted
standard of medical care, or health care, or safety or professional
administrative services directly related to health care, [3] which proximately
results in injury to or death of a claimant, whether the claimant's claim or
cause of action sounds in tort or contract.


Id. § 74.001(a)(13) (Vernon 2005) (numbering added). Chapter 74 also defines "health
care" as "any act or treatment performed or furnished, or that should have been performed
or furnished, by any health care provider for, to, or on behalf of a patient during the
patient's medical care, treatment, or confinement." Id. § 74.001(a)(10) (Vernon 2005).

 In applying the above definitions to a pleading, we examine the claim's underlying
nature. Garland Cmty. Hosp. v. Rose, 156 S.W.3d 541, 543 (Tex. 2004); Sorokolit v.
Rhodes, 889 S.W.2d 239, 242-43 (Tex. 1994); see Victoria Gardens of Frisco v. Walrath,
257 S.W.3d 284, 287 (Tex. App.-Dallas 2008, pet. denied); see Valley Baptist Med. Ctr.
v. Azua, 198 S.W.3d 810, 814 (Tex. App.-Corpus Christi 2006, no pet.). If the act or
omission alleged in the complaint is an inseparable part of the rendition of health care
services then the claim is a health care liability claim. See Diversicare Gen. Partners, Inc.
v. Rubio, 185 S.W.3d 842, 849 (Tex. 2005); Rose, 156 S.W.3d at 544 (citing Walden v.
Jeffery, 907 S.W.2d 446, 448 (Tex. 1995) (per curiam)).

 We focus on the nature and essence of the claim and are not bound by the form of
the pleading. Diversicare, 185 S.W.3d at 847, 851; see Sorokolit, 889 S.W.2d at 242;
Parker v. CCS/Meadow Pines, Inc., 166 S.W.3d 509, 512 (Tex. App.-Texarkana 2005, no
pet.). "Plaintiffs cannot use artful pleading to avoid the . . . [Chapter 74] requirements
when the essence of the suit is a health care liability claim." Pallares v. Magic Valley
Electric Coop., Inc., 267 S.W.3d 67, 71 (Tex. App.-Corpus Christi 2008, pet. denied)
(quoting Rose, 156 S.W.3d at 543). "However, courts must be equally careful not to
extend chapter 74's reach beyond its stated bounds." Id. "Not every action taken by a
health care provider or every injury sustained by a patient is a health care liability claim." 
Id.

IV. Nature of Alvarez's Claim It is undisputed that Dr. Tesoro is a physician and that Alvarez filed a claim against
him; thus, the first element necessary to establish a health care liability claim--that the
claim be against a physician--has been satisfied. See Tex. Civ. Prac. & Rem. Code Ann.§
74.001(a)(13); see also id. § 74.001(a)(23) (Vernon 2005) (defining "physician" as "an
individual licensed to practice medicine in this state"). Accordingly, we sustain Dr. Tesoro's
second issue that presents this argument. In addition, the third element--that the alleged
improper use of the laser proximately caused Alvarez's injury--is not at issue in this
appeal. See id. § 74.001(a)(13). Therefore, in determining the nature of Alvarez's claim,
we address only the second element--the "for treatment" element--of a health care liability
claim. See id.

 In his first and third issues, Dr. Tesoro contends that this second element has been
satisfied because "health care" forms the basis of Alvarez's allegations. See id. In support
of his argument, Dr. Tesoro asserts that, in this case, laser hair removal constitutes "health
care" because Alvarez referred to it as "treatment" in her petition, the hair was removed
in a medical clinic, records were generated, and the procedure was performed with a
regulated medical device.

A. Use of "Treatment" in Petition

 Relying on Sarwal v. Hill, a memorandum opinion from the Houston First Court of
Appeals, Dr. Tesoro asserts that we should conclude that Alvarez's claim constitutes
"health care" because Alvarez referred to the complained-of act as "treatment" when she
stated in her petition that "Blount performed laser hair removal treatment." See No. 14-01-01112-CV, 2002 Tex. App. LEXIS 8783, at *8-*9 (Tex. App.-Houston [14th Dist.] Dec. 12,
2002, no pet.) (mem. op.). However, the Sarwal court concluded that the cause of action
asserted in Sarwal's petition was framed only as a health care liability claim not only
because the petition consistently referred to the laser hair removal as "treatment" or
"therapy," but because the petition also stated that Sarwal had complied with the
requirements of 4590i, the medical liability act in effect at that time, and had affirmatively
stated that Hill's allegedly deficient actions and omissions were all breaches of the nursing
standard of care. Id.

 The present case is distinguishable from Sarwal. Using the word "treatment" only
once in her petition, Alvarez described the alleged negligent act as follows: "[i]n or around
May of 2006, Blount performed laser hair removal treatment upon [her] legs, so as to
severely to burn and scar [her] legs." Her allegations assert improper use of the laser. 
Alvarez does not assert that Dr. Tesoro deviated from an accepted standard of medical
care or that Blount's actions breached the nursing standard of care. And, Alvarez does not
claim that she complied with the medical liability statute, as did the appellant in Sarwal. 
See id. Rather, Alvarez framed her claims only as common law negligence claims--that
Blount was negligent when he used the laser improperly and that Dr. Tesoro was
vicariously liable for Blount's actions.

 In addition, "health care" is "any act . . . performed or furnished, or that should have
been performed or furnished, by any health care provider for, to, or on behalf of a patient
during the patient's medical care, treatment, or confinement." Tex. Civ. Prac. & Rem. Code
Ann. § 74.001(a)(13) (emphasis added). Dr. Tesoro does not argue, and the record does
not support, that the basis of Alvarez's claim is "health care" because the complained-of
act occurred during her confinement or during her medical care, the general definition of
which is "practicing medicine." See id. § 74.001(a)(19) (defining medical care); see also
Tex. Occ. Code Ann. § 151.002(a)(13) (Vernon Supp. 2008) (defining "practicing medicine"
as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or
a physical deformity or injury"). Dr. Tesoro appears to contend only that the complained-of
act occurred during Alvarez's treatment, and because Alvarez used the word "treatment"
in her petition, it must be for "health care." 

 Even though "treatment" is used in the definition of "health care" and in the
definitions of "health care liability claim," "medical care," and "practicing medicine," the
legislature chose not to define "treatment." Dr. Tesoro directs us to no case law, and we
find none, that considers how "treatment" is defined within the context of laser hair removal
at common law. Cf. Powers v. Floyd, 904 S.W.2d 713, 717 (Tex. App.-Waco 1995, writ.
denied) (defining "treatment" broadly as "to care for or deal with medically or surgically" in
a parental consent case under section 12.04(6) of the family code); Skloss v. Perez, No.
01-08-00484-CV, 2009 Tex. App. LEXIS 89, *15, *20-*23 (Tex. App.-Houston [1st Dist.]
Jan. 8, 2009, no pet. h.) (mem. op.) (concluding that a licensed professional counselor was
a health care provider providing health care treatment when she assessed, evaluated, and
treated appellees' mental health disorders). Therefore, we look to the plain meaning of
"treatment" to determine its application in this case. See Tex. Civ. Prac. & Rem. Code Ann.
§ 74.001(b) (Vernon 2005) ("Any legal term or word of art used in this chapter, not
otherwise defined in this chapter, shall have such meaning as is consistent with the
common law."); Kendrick v. Garcia, 171 S.W.3d 698, 704 (Tex. App.-Eastland 2005, pet.
denied) ("[Section 74.001(b)] essentially restates the rule of statutory construction that
terms in a statute are to be given their plain meaning.").

 The term "treatment" is defined in common usage as "the act or manner or an
instance of treating someone or something" and as "the techniques or actions customarily
applied in a specific situation." Merriam-Webster's Collegiate Dictionary 1333 (11th
ed. 2003). Within the medical context, "treatment" is defined as "the care and
management of a patient to combat, ameliorate, or prevent a disease, disorder, or injury." 
Mosby's Medical Dictionary 1880 (8th ed. 2009). Also, the Medline Plus online dictionary
defines "treatment" in the medical context as "the action or manner of treating a patient
medically or surgically" and "treat" as "to care for or deal with medically or surgically: deal
with by medical or surgical means." Medline Plus,
www.nlm.nih.gov/medlineplus/mplusdictionary.html (search "Enter search term" for
"treatment" or "treat").

 Based on the definition of "treatment" in the medical context, the record does not
support a determination that Alvarez's care was "to combat, ameliorate, or prevent a
disease, disorder, or injury," see Mosby's Medical Dictionary at 1880, or that she was
treated, cared for, or dealt with medically or surgically. See Medline Plus,
www.nlm.nih.gov/medlineplus/mplusdictionary.html (search "Enter search term" for
"treatment" or "treat"). However, applying the definition in common usage or plain meaning
of the word, Alvarez's use of "treatment" could have referred to "techniques or actions
customarily applied in a specific situation" which, in this case, would have been a reference
to techniques or actions customarily applied in the use of a laser during hair removal. See
Merriam-Webster's Collegiate Dictionary at 1333. Thus, we cannot conclude that
labeling laser hair removal as "treatment" in her petition supports a determination that the
underlying nature of Alvarez's claim is "health care."

B. Context of Treatment

 Dr. Tesoro also contends that "health care" forms the basis of Alvarez's allegations
because of the context in which her laser hair removal occurred. While we agree that the
context in which a procedure occurs may include factors to be considered, we disagree
that the identified factors are determinative in this case.

1. Documentation

 Dr. Tesoro first asserts that "health care" forms the basis of Alvarez's allegations
because, prior to the laser hair removal procedure, Alvarez's medical history was taken. 
He comments that, unlike getting a haircut or manicure, records, including an informed
consent, a medical history, and progress notes, are generated throughout the hair removal
procedure, and because such forms are routinely generated, Alvarez's allegations are
based on "health care." However, Dr. Tesoro also acknowledges that he is uncertain as
to whether these documents were generated for Alvarez because she may have used an
alias and because TSMAC has closed since the events at issue and the records, if any,
may no longer exist. In addition, although Dr. Tesoro stated in his affidavit attached to his
motion to dismiss that Blount took Alvarez's medical history before he performed the laser
hair removal, a completed medical history form for Alvarez does not appear in the record. (3) 
Therefore, this argument is without support.

2. Location

 Dr. Tesoro also argues that the basis of Alvarez's allegations is "health care"
because the procedure was performed at a medical clinic. It is undisputed that the
procedure was performed at TSMAC, and Alvarez does not dispute that it is a medical
clinic as Dr. Tesoro describes. Nonetheless, the fact that conduct occurs in a medical
clinic cannot, by itself, transform the conduct into "health care." As courts have
acknowledged in safety-claims cases, "[t]here may be circumstances that give rise to
premises liability claims in a healthcare setting that may not be properly classified as health
care liability claims." Harris Methodist Fort Worth v. Ollie, 270 S.W.3d 720, 724 (Tex.
App.-Fort Worth 2008, no pet.) (quoting Diversicare, 185 S.W.3d at 854). Likewise, there
may be circumstances that give rise to general negligence claims in a healthcare setting
that may not be properly classified as a health care liability claims.

 In this case, although the complained-of act occurred at a medical facility, Alvarez 
expressed in her response to Dr. Tesoro's motion to dismiss that she went to the medical
clinic because she desired to have unwanted hair removed from her legs. She explained
that Blount removed the hair and that Dr. Tesoro had "no personal involvement in the
subject use of a laser to remove [her] leg hair." Alvarez does not claim that her laser hair
removal was prescribed, recommended, supervised, or in any other way conducted by Dr.
Tesoro at the medical clinic, and Dr. Tesoro provides no support of his involvement in the
procedure, by order or otherwise.

C. Regulated Medical Device

 Finally, Dr. Tesoro contends that because the act of alleged negligence involved a
regulated medical device, "health care" forms the basis of the allegations. Without
explanation, Dr. Tesoro identifies regulations and documentation relevant to the MeDioStar
HC laser, but offers no authority, and we find none, that supports his general contention.

 Nonetheless, it is undisputed that the MeDioStar HC laser is a Class II prescription
medical device and is registered with, and regulated by, the U.S. Food and Drug
Administration (FDA). (4) See 21 C.F.R. § 801.109 (2008) (defining prescription devices); id.
§ 878.4810 (identifying lasers as Class II devices); (5) Federal Food, Drug, and Cosmetic Act
(FFDCA) § 201(h), 21 U.S.C.A. § 321(h) (1999) (defining "medical device"). A prescription
device is described as follows:

 A device which, because of any potentiality for harmful effect, or the
method of its use, or the collateral measures necessary to its use is not safe
except under the supervision of a practitioner licensed by law to direct the
use of such device, and hence for which "adequate directions for use"
cannot be prepared . . . .


21 C.F.R. § 801.109. It is "a device that cannot have adequate directions for lay use." 
Rayford v. State, 16 S.W.3d 203, 209 (Tex. App.-Dallas 2000, pet. denied) (op. on rehr'g). 
However, section 801.109 provides an exemption from the adequate-directions-for-use
requirement if the device is "[i]n the possession of a practitioner, such as physicians,
dentists, and veterinarians, licensed by law to use or order the use of such device" and it
"[i]s to be sold only to or on the prescription or other order of such practitioner for use in
the course of his professional practice." 21 C.F.R. § 801.109(a)(1) (ii), (2).

 If a device does not bear adequate directions that enable the consumer to be able
to use it, the device is deemed to be misbranded under the FFDCA. See FFDCA § 502(f),
21 U.S.C.A. § 352(f) (1999 ed. and Supp. 2008) (setting out labeling provisions); see also
21 C.F.R. § 201.5 (2008) (defining "adequate directions for use" as "directions under which
the layman can use a device safely and for the purposes for which it is intended"). 
However, if the device is exempted from the adequate-directions-for-use requirement it is
not misbranded if it is in the possession of a practitioner, such as a physician, dentist or
veterinarian, or is used on order of a practitioner for use in the course of his professional
practice. (6) Rayford, 16 S.W.3d at 209 (citing 21 C.F.R. § 801.110) (1999)); see 21 C.F.R.
§ 801.109(a)(1)(ii), (2) (providing an exemption from the directions-for-use requirement).

 Dr. Tesoro relies on the above restrictions, regulations, and documentation to
support his contention that laser hair removal treatment constitutes "health care," making
Alvarez's claim a health care liability care. We are not, however, persuaded by this
argument. The restrictions upon which Dr. Tesoro relies address exemption-from-labeling
requirements. They are relevant to the determination of misbranding violations of medical
devices to be sold in commerce and to those already in commerce. See Rayford, 16
S.W.3d at 205. The provisions are not specific performance standards; they form no
predicate for a health care liability claim. (7)

D. Other Factors to Consider

1. Operators of Laser Device

 Although the above regulations provide for physician involvement in the use of laser
hair removal devices, Dr. Tesoro refers us to no FDA regulation, or to authority of any kind,
that requires operators who use the MeDioStar HC laser for hair removal to be physicians
or other heath care providers. It appears that there are no requirements in Texas for
operators with respect to medical qualifications, credentialing, or licensure. (8) It is even
unclear as to what training, if any, is required. Thus, although the laser is to be delivered
to or in the possession of a physician or used on order of a physician, the laser hair
removal device could be used by a lay person without a physician or a health care provider
present. This factor has significance in our determination of the nature of Alvarez's claim.

2. Other Jurisdictions

 Moreover, while we have no binding Texas authority on the issue of whether laser
hair removal is a health care service, other jurisdictions have addressed the issue within
the meaning of their respective medical malpractice acts. In OB-GYN Assocs. of N. Ind.
v. Ransbottom, being guided by the substance of the claim with primary emphasis on "the
causal connection between the conduct and the nature of the patient and healthcare
provider relationship," the Indiana Court of Appeals addressed the following significant
considerations in arriving at the conclusion that laser hair removal treatment did not
constitute "health care" within the meaning of the Indiana Medical Malpractice Act: (1)
"physicians were not involved in [the] treatment,"and (2) "the operator of the laser machine
was not required to be a healthcare worker or possess healthcare credentials such as
medical degrees, medical licensure, or medical certification in order to operate the
machine." 885 N.E.2d 734, 739-40 (Ind. Ct. App. 2008). Other factors the court
considered that favored a health-care finding included (1) the site of the treatment--a
medical facility, (2) a registered nurse employed at the facility operated the laser machine,
and (3) the laser machine is a piece of equipment intended to work on the human body and
its misuse could cause injury. Id. Of marginal significance weighing in favor of it being a
non-health care determination was that the laser treatment was entirely cosmetic. Id. In
answer to the question, "What is it that distinguishes claims against medical providers as
sounding in standard negligence or medical malpractice?", the Indiana Court of Appeals
answered as follows:

 In this case, it is the fact that laser hair removal treatment may be
administered without the involvement of medical doctors. As we have
already observed several times, no physician participated in Ransbottom's
laser hair removal treatment. Moreover, and significantly, no healthcare
professional was required to. A doctor-patient relationship is a prerequisite
to maintaining a malpractice action. As a general rule, where a doctor does
not in any way participate in the plaintiff's care or treatment, a doctor-patient
relationship will not be found to exist.


Id. at 740 (citations omitted). The court concluded that the laser hair removal treatment
did not constitute "health care" within the meaning of Indiana's medical malpractice act. 
Id.

 In Mitchell v. McEvoy, a statute-of-limitations summary judgment case, the Missouri
Court of Appeals addressed the issue of whether laser hair removal is a "health care
service" under section 516.105 of the Missouri Revised Statutes. 237 S.W.3d 257, 260
(Mo. App. 2007). In Mitchell, the laser hair treatment was performed by a registered nurse
at a physician's office located on a medical center campus. Id. at 258. Mitchell claimed
that McEvoy was negligent because she (1) failed to test or inspect the laser hair removal
device; (2) failed to observe the damage done by the defective device before the
completion of the treatment; or (3) calibrated or damaged the device causing it to lose
calibration prior to the treatment. Id. McEvoy argued that the claim was a "health care
service" because "she performed the procedure during the course of her employment with
[a physician]," and "as part of her practice of her profession as a nurse." Id. at 260. The
court's research revealed that laser hair removal was wholly unregulated in Missouri and
that, although the legislators have proposed a bill "which would authorize the promulgation
of rules regarding the training and authorized use of lasers and pulse light sources by
cosmetologists," direct the state board to identify lasers capable of coagulating tissue, and
require a licensed physician to directly supervise the use of such lasers, as of the date the
opinion issued, the bill had not yet been acted upon. Id. at 261. The court noted that the
bill, although not enacted, brought to light the amount of information that was lacking in the
record before it, including, among other things, that although McEvoy stated she was
performing the procedure in the course of her employment as a nurse, she did not state
whether she performed the procedure under the supervision of the physician. Id. Based
on this reasoning, the Missouri Court of Appeals determined, in this summary-judgment
case, that the trial court did not have sufficient evidence to conclude, as a matter of law,
that the defendant was performing a "health care service" and, thus, did not establish that
the two-year health care statute of limitations controlled. Id.

3. Texas Legislation and Texas Medical Board "Laser Rule"

 We acknowledge that the above opinions are not controlling. However, the
reasoning provided by both courts is informative, especially in light of an additional factor
relevant to our analysis; that factor being recent action or inaction of the Texas Medical
Board (TMB) and the Texas Legislature regarding laser hair removal legislation. See Laura
Jeanne Sanger, Laser Hair Removal, Health Law Perspectives, April 2008,
http://www.law.uh.edu/healthlaw/perspectives/2008%20(LSK)laser.pdf (discussing the
general history and status of Texas rules, litigation, and legislation involving laser hair
removal).

 In 2003, the Texas Medical Board (TMB) sought to establish guidance regarding the
use of lasers in laser hair removal, guidance referred to as the Laser Rule. Id. at p.3 (citing
TMB Rules, Sec. 193.11, Use of Lasers (22 Tex. Admin. Code § 193.11)). The Laser
Rule's enactment was delayed when two declaratory judgment lawsuits were filed in Travis
County challenging the physician supervision and training requirements set forth in the
Laser Rule. See id. at pp.3-4 (citing Finder v. Tex. State Board of Med. Examiners, No.
GN400891 (98th Ct., Travis County, Tex. Mar. 16, 2004); Laser Hair Removal
Stakeholders Group v. Tex. State Board of Med. Examiners, No. GN403910 (201st Ct.,
Travis County, Tex. Dec. 1, 2004)). The parties subsequently agreed to abate the cases
and the enforcement of the Laser Rule, pending action by the Texas Legislature. Id. at p.
4 (citing TMB, Information and Current Standing: Standing Delegation Orders and Rule
193.11 Use of Lasers,
http://www.tmb.state.tx.us/professionals/calendar/minutes/doc/2004/December04/).

 Legislation related to laser hair removal that was introduced to the 79th legislative
session was not enacted. During the 80th legislative session, two house bills were
introduced. See Tex. H.B. 174, 80th Leg., R.S. (2007); Tex. H.B. 3368, 80th Leg., R.S.
(2007). House Bill 174 was introduced as an amendment to the Texas Occupations Code. 
See Tex. H.B. 174, § 1604.001-.411, 80th Leg., R.S. (2007) (addressing the regulation of
laser hair removal facilities and providing civil penalties for non-compliance). It proposed
adding chapter 1604, "Laser Hair Removal," to Title 9, "Regulation of Barbers,
Cosmetologists, and Related Occupations." See id. House Bill 174 provided that laser
hair removal procedures were "neither the practice of medicine nor a medical procedure." 
Id. § 1604.002.

 Subsequently, House Bill 3368 was introduced in the 80th Legislature as an
amendment to chapter 157 of the occupations code, a chapter that provides for authority
of physicians to delegate certain medical acts. See Tex. H.B. 3368, §§ 157.151-.157, 80th
Leg., R.S. (2007). It differed significantly from the earlier house bill. House Bill 3368
provided for the addition of a subchapter to the occupations code that provided physicians
with authority to delegate certain medical acts and to supervise non-physicians performing
medical acts, specifically certain laser hair removal procedures. See id. It also stated
"laser hair removal treatments, procedures or services are the practice of medicine and
may only be performed or delegated in accordance with this [Medical Practice] Act." Id.
§ 157.152.

 Neither House Bill 174 nor House Bill 3368 was enacted. Furthermore, on June 27,
2008, a motion was passed by the Texas Medical Board which, in part, repealed the Laser
Rule. See TMB, Board Meeting Minutes June 27, 2008,
http://www.tmb.state.tx.us/professionals/calendar/minutes/doc/2008/june26/Full_Board_mi.
. .) (citing 22 Tex. Admin. Code § 193).

 Recently, two bills have been introduced to the 81st legislative session. House Bill
449, regarding the regulation of a laser hair removal facility, was introduced as an
amendment to health and safety code, chapter 401, titled "Radioactive Materials and other
Sources of Radiation." See Tex. H.B. 449, 81st Leg., R.S. (2009). The bill does not state
whether or not the procedures are the practice of medicine. House Bill 449 does provide,
as did House Bill 174, for certification of and continuing education for laser hair removal
professionals, senior laser hair removal technicians, laser hair removal technicians, and
laser hair removal apprentice-in-training. Id. § 401.054-509. It also requires a facility
license. Id. § 401.510. Finally, House Bill 449 provides for a consulting physician who
would establish proper protocols for services provided at the facility and who must be
available for emergency consultation with the facility. Id. § 401.519. House Bill 449 was
filed on December 19, 2008, and was read to the House for the first time and referred to
the House Committee on Public Affairs on February 18, 2009.

 House Bill 574 was also introduced to the 81st Texas Legislature as an addition to
the Texas Health and Safety Code, Title 2, Health, and Subtitle G, Licenses. See Tex.
H.B. 574, 81st Leg., R.S. (2009). This bill addresses disclosures that must be made at a
facility performing certain laser cosmetic procedures. See id. House Bill 574 was filed on
January 12, 2009 and, like House Bill 449, was read to the House for the first time and
referred to the House Committee on Public Affairs on February 18, 2009.

E. Analysis Considering All Factors and Circumstances

 In sum, we consider all of the factors and circumstances set out above in
determining the nature of Alvarez's claims. Alvarez's allegations assert improper use of
the laser. The substance of Alvarez's negligence claim is that Blount's improper use of the
laser device caused her injuries; it is not that Blount provided health care treatment that
caused her injuries. The substance of her allegations is that Dr. Tesoro, through Blount,
failed to properly use the laser during the hair removal process; it is not that Dr. Tesoro
vicariously failed to provide proper health care treatment. Alvarez's claim does not center
on any medical treatment provided by Dr. Tesoro or on breaches of medical care or of
nursing care, but rather on Blount's use of the laser during the hair removal process. As
we concluded above, Alvarez framed her claims only as common law negligence
claims--that Blount was negligent when he used the laser improperly and that Dr. Tesoro
was vicariously liable for Blount's actions.

 Based on Alvarez's petition, Dr. Tesoro was sued only as a general partner of
TSMAC where the procedure was performed. Blount was identified as Dr. Tesoro's agent. 
Based on our review of the record, Dr. Tesoro neither supervised nor participated in the
laser hair removal procedure performed by Blount, not even by prescription or other order
as required by the FDA. Without involvement in Alvarez's care, no doctor-patient
relationship would be found to exist between Alvarez and Dr. Tesoro. See St. John v.
Pope, 901 S.W.2d 420, 423 (Tex. 1995) ("The duty to treat the patient with proper
professional skill flows from the consensual relationship between the patient and physician,
and only when that relationship exists can there be a breach of a duty resulting in medical
malpractice."); Ramirez v. Carreras, 10 S.W.3d 757, 761 (Tex. App.-Corpus Christi 2000,
pet. denied). And, importantly, the laser hair removal device could be used without a
physician or a health care provider present as no healthcare professional is even required
to participate in a procedure. These concerns are not changed by the fact that the
procedure was performed at a medical clinic by a person who happened to be a registered
nurse. Laser hair removal is unregulated in Texas at this time, and it is apparent that the
Texas Legislature is uncertain regarding its position on such regulation. Although laser hair
removal bills have been proposed, none have been enacted. Likewise, the Texas Medical
Board has withdrawn its position on this issue, apparently waiting for the legislature to act.

 Therefore, examining the underlying nature of Alvarez's claim, Rose, 156 S.W.3d
at 543, and being careful not to extend chapter 74's reach beyond its stated bounds,
Pallares, 267 S.W.3d at 71, we conclude that the alleged act of improperly using the laser
is not, in this case, an inseparable part of the rendition of health care services. See
Diversicare, 185 S.W.3d at 849 (Tex. 2005); Rose, 156 S.W.3d at 544. Thus, the second
element of the definition of a "health care liability claim"--that laser hair removal involves
treatment related to health care--is not satisfied, see Tex. Civ. Prac. & Rem. Code Ann.
§ 74.001(a)(13), and Alvarez's allegations do not constitute a health care liability claim. 
Alvarez alleged only an ordinary negligence claim. To whatever extent the complained-of
act could have been stated as a health care liability claim, it was simply not cast as such
by Alvarez. We overrule Dr. Tesoro's first and third issues.

V. Filing of Expert Report

 By his fourth issue, Dr. Tesoro contends that the trial court erred by denying his
motion to dismiss because Alvarez failed to file an expert report within 120 days of filing
her claim. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). However, because Alvarez
did not assert a health care liability claim, she was not required to file an expert report. 
See id. We overrule Dr. Tesoro's fourth issue.

VI. Conclusion

 Accordingly, we affirm the trial court's denial of Dr. Tesoro's motion to dismiss.

 

 NELDA V. RODRIGUEZ

 Justice


Opinion delivered and filed this

12th day of March, 2009.


1. Dean Joshua Blount, R.N., is not a party to this appeal.
2. This device is also referred to, in the record, as an 810 Diode Laser.
3. Copies of a standard medical history form and a standard consent form used by the Texas
SouthWest Medical Aesthetics Clinique are included in the appendix of Dr. Tesoro's brief. Dr. Tesoro claims
that these documents were produced in response to written discovery requests. Also included in the appendix
is a progress note form for Hilda Martinez, the alleged alias used by Alvarez. The progress note documents
one visit on June 21, 2006. These documents do not, however, appear in the clerk's record filed in this
appeal. Accordingly, we can not consider them. See Gonzalez v. Villarreal, 251 S.W.3d 763, 777 n.17 (Tex.
App.-Corpus Christi 2007, pet. dism'd w.o.j.).
4. The manufacturer filed a premarket notification (510(K)) with the Food and Drug Administration (FDA)
representing that the intended use of the laser is "to remove unwanted body hair and vascular lesions." See
21 C.F.R. § 814.20 (2008). In response, the FDA approved the marketing of the laser indicating that its
intended use is "to remove unwanted body hair and vascular lesions" and that "the laser system . . . is
restricted to sale to or use by licensed professionals [such as physicians, dentists, and veterinarians] in the
United States" and, thus, is for "prescription use" not over-the-counter use. See id. § 801.109(a)(1) (ii), (2)
(2008).
5. Class II items are more complex than Class I and include such devices as
oxygen masks used in anesthesiology . . . [and lasers]. These may be
subject to recommendations, guidelines, post-marketing surveillance, the
development of patient registries, and even the promulgation of specific
performance standards, should the [Food and Drug Administration] deem
them a sufficient health hazard as to require strict product specifications or
warnings.


Stamps v. Collagen Corp., 984 F.2d 1416, 1418 (5th Cir. 1993) (citing 21 U.S.C.A. § 306c(a)(B)).
6. "Order" refers to a physician's order, standing medical order, standing delegation order, or other order
for protocol as noted by Rep. Byron Cook in H.B. 3368, a bill introduced to the 80th Texas Legislature but not
enacted. See Tex. H.B. 3368, § 157.152(5), 80th Leg., R.S. (2007).
7. Dr. Tesoro does not argue that medical expert testimony would be necessary for Alvarez to establish
that the laser machine was used improperly. See Diversicare Gen. Partners, Inc. v. Rubio, 185 S.W.3d 842,
848 (Tex. 2005); Garland Cmty. Hosp. v. Rose, 156 S.W.3d 541, 544 (Tex. 2004) (noting that one
consideration in determining whether alleged act or omission is inseparable part of rendition of health care
is whether proving claim would require specialized knowledge of a medical expert). Even if it is later
determined that medical expert testimony is needed, it is clear to us for the reasons detailed above that the
nature of Alvarez's claims does not constitute health care liability claims invoking chapter 74. See Pallares
v. Magic Valley Electric Coop., Inc., 267 S.W.3d 67, 74-75 (Tex. App.-Corpus Christi 2008, pet. denied) (citing
Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13) (Vernon 2005); see, e.g.,Yamada v. Friend, No.
2-07-177-CV, 2008 Tex. App. LEXIS 1680, at *10 (Tex. App.-Fort Worth Feb. 28, 2008, pet. granted) (mem.
op.) ("The fact that expert medical testimony may be needed at some point in a case does not perforce create
a health care liability claim")). Therefore, we need not address the issue of expert testimony as it is not
necessary to the final disposition of the appeal. See Tex. R. App. P. 47.1.
8. We note that the American Board of Laser Surgery is the sole medical testing board in the United
States for laser surgery, providing certification for medical professions. See
http://www.americanboardoflasersurgery.org/ The American Board of Laser Surgery was incorporated in 1984
and has as its mission statement the following: "[f]ounded to promote the safe and efficacious use of lasers
in medicine and surgery by establishing standards of acceptable levels of knowledge and competence through
a certifying examination for medical professionals." Id.