

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-11-00011-CV

_____

DARLENE STANFORD, INDIVIDUALLY, AND
JACK M. THOMAS, M.D., D/B/A COSMETIC SKIN LASER
AND HAIR REMOVAL OF GREENVILLE, Appellants

V.

RANDY CANNON, Appellee

On Appeal from the County Court at Law No. 2
Hunt County, Texas
Trial Court No. CC1000321

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM  OPINION

This is an interlocutory appeal from an order denying the motion of the defendants, Darlene Stanford and Jack M. Thomas, M.D., to dismiss the suit against them pursuant to Section 74.351(b) of the Texas Civil Practice and Remedies Code due to the failure of Randy Cannon to file an expert report in a suit involving a health care liability claim.   TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b) (West 2011).[1]   Stanford and Thomas argue that the trial court abused its discretion in finding that the suit of Cannon did not involve health care liability claims and, therefore, no expert report was required to be filed.   We reverse the judgment and remand to the trial court for further proceedings.

## I.      Background and Procedural Posture

In July 2008, Cannon sought cosmetic laser hair removal from his genitalia.   As a predicate to receiving the laser hair removal treatment, Cannon filled out a medical history form and a consent form explaining the mode of action of the treatment, the proposed benefits of treatment, the probability of success and the possible complications of treatment.   The consent form stated, "I consent to allow the medical personnel at Cosmetic Skin Laser & Hair Removal of Greenville under the supervision and control of Jack Thomas M.D. to perform Laser Hair Removal with the CoolGlide™ Nd-Yag Laser."   Cannon's signature appears on a line under which he is designated as "Patient."   Thomas signed and dated notes (written by Stanford) in Cannon's file.

---

[1]See TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (West 2008) (providing interlocutory appeal from order denying relief sought by motion under Section 74.351(b)).

2

The first set of notes, dated June 19, 2008, indicate that Stanford "called Dr. Birken to verify settings for this particular area. Dr. Birken advises to use settings specific to his skin type without tanning." The notes then relate that, "Mr. Cannon is uncomfortable but insists that he is okay. I advised him not to expose the area to any other kind of heat for 24 hours (hot bath, hot tub, tanning beds, etc.) Should a blister come up, apply a topical burn ointment such as polysporin."

Cannon returned for a second laser hair removal treatment on July 24, 2008. Once again, Stanford's notes regarding this second session are signed by Thomas. The notes indicate that "Mr. Cannon is not pleased with the results of his first treatment. . . . He asked that I use a stronger setting. I told him that I would not use a stronger setting but I would use a different attachment. . . . I explained that this could be more painful. . . . During the treatment Mr. Cannon was uncomfortable and his eyes watered. . . . After the treatment, I advised him to apply cold packs to the area and not to expose it to any heat for 24 hours . . . ."

Cannon filed a lawsuit against Stanford and Thomas wherein he alleged that as a result of the laser procedures administered by Stanford, Cannon suffered scarring of and second-degree burns to his penis and scrotum. While the consent form indicated the procedures would be accomplished under Thomas' supervision and control, the petition makes no allegation that Thomas participated in the procedure. Rather, the petition alleges:

### E. NEGLIGENCE

4.      At the time of the incident, Defendant Darlene Stanford, was negligent in her operation of the hair removal equipment. Defendant had a duty to

3

exercise ordinary care and operate the laser reasonably and prudently. Defendant breached that duty in one or more of the following ways:

    a.      Failure to skillfully and properly use the laser device;

    b.      Failing to stop the laser treatment in a timely manner.

### F.  VICARIOUS LIABILITY

5.     At the time of the laser hair removal on Plaintiff Randy Cannon, Dr. Jack M. Thomas was the owner of Cosmetic Skin Laser & Hair Removal of Greenville, ("Cosmetic Skin Laser"), located in Greenville, TX. As the owner of the facility, and as supervising physician of the facility, Dr. Jack Thomas was vicariously liability [sic] for the negligent actions of Defendant Darlene Stanford.

When Cannon failed to file an expert report within 120 days of the filing of the suit in conformity with Section 74.351(b) of the Texas Civil Practice and Remedies Code, Stanford and Thomas (referred to hereafter collectively as Stanford) filed a motion to dismiss. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (b) (West 2011). Cannon responded by asserting that his was not a health care liability lawsuit, maintaining that, rather, his claims were governed by a standard of ordinary care and were claims for common-law negligence, with Thomas being vicariously liable (as the owner of the clinic) for the damages inflicted on him by Stanford. The trial court determined that Cannon's claims were not health care liability claims and denied Stanford's motion to dismiss. Stanford filed this interlocutory appeal. TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9).

4

The sole issue on appeal is whether Cannon's claims are health care liability claims (which would require him to file an expert report within the specified time), or whether his claims are brought only as an ordinary negligence claim (in which case, Cannon was not obliged to file such a report).

## II.      Analysis

### A.      Standard of Review

Generally, we review a trial court's ruling on a motion to dismiss for failure to timely file an expert report under Section 74.351(a) of the Texas Civil Practice and Remedies Code under an abuse of discretion standard. *Rittenhouse v. Sabine Valley Ctr. Found.*, *Inc.*, 161 S.W.3d 157, 163 (Tex. App.—Texarkana 2005, no pet.). However, when the resolution of this issue requires the interpretation of a statute, review is conducted under a de novo standard. *Vanderwerff v. Beathard*, 239 S.W.3d 406, 408 (Tex. App.—Dallas 2007, no pet.). In determining whether Cannon's claim is a health care liability claim for the purpose of applying Chapter 74 of the Texas Civil Practice and Remedies Code, we apply a de novo standard of review. *Omaha Healthcare Ctr.*, *L.L.C. v. Johnson*, 246 S.W.3d 278, 281 (Tex. App.—Texarkana 2008, pet. filed); *Boothe v. Dixon*, 180 S.W.3d 915, 919 (Tex. App.—Dallas 2005, no pet.); *cf. Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 543–44 (Tex. 2004) (under predecessor statute, essentially conducting de novo review, though not stating standard).

**B.       Applicable Law**

Section 74.351(a) provides a health care liability claimant must file an expert report and a curriculum vitae of the expert within 120 days after filing the claim.   TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a).   If a required expert report has not been served by the 120-day deadline, on proper motion by the defendant, the trial court is required to dismiss the action with prejudice and award reasonable attorney's fees and court costs incurred by the defendant.   TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b).   Section 74.351(a) applies only to health care liability claims. *Jones v. Christus Health Ark-La-Tex*, 141 S.W.3d 790, 792, 793 (Tex. App.—Texarkana 2004, no pet.).

> A "[h]ealth care liability claim" means
>
> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13) (West 2011).   "Health care" is defined as

> any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(10) (West 2011).

In determining whether Cannon asserted a health care liability claim, we must examine the underlying nature of the claim.   *Rose*, 156 S.W.3d at 543; *Parker v. CCS/Meadow Pines, Inc.*, 166

6

S.W.3d 509, 512 (Tex. App.—Texarkana 2005, no pet.). A health care liability claim cannot be recast as another cause of action in an attempt to avoid the expert report requirement. *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 851 (Tex. 2005). We are not bound by the form of the pleading. *Id.* at 847. When the essence of the suit is a health care liability claim, a party cannot avoid the requirements of the statute through artful pleading. *Rose*, 156 S.W.3d at 543; *see Yamada v. Friend*, 335 S.W.3d 192 (Tex. 2010) (unchallenged holding that claims encompassing physician's safety advice to water park were health care liability claims required dismissal of all claims arising from same facts on theory of improper claim-splitting). In determining whether a claim is a health care liability claim, we consider whether testimony from a medical or health care professional is necessary to prove the claim. *Rubio*, 185 S.W.3d at 848, 851. However, a claim may be a health care liability claim even if it does not require expert testimony to prevail at trial. *See Murphy v. Russell*, 167 S.W.3d 835, 838 (Tex. 2005).

### C.    Cannon's Claims

Here, applying Chapter 74, we determine the hairy question of whether Cannon's claims in this case are health care liability claims by analyzing whether his cause of action is for "treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety." TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13). There is no dispute that Stanford and Thomas are health care providers. *See* TEX. CIV. PRAC. & REM. CODE ANN.

§ 74.001(a)(12).[2]   Stanford contends the gravamen of this claim alleges a departure from accepted standards of medical or health care.   In response, Cannon relies on *Tesoro v. Alvarez*, 281 S.W.3d 654 (Tex. App.—Corpus Christi 2009, no pet.), and *Ghazali v. Brown*, 307 S.W.3d 499 (Tex. App.—Fort Worth 2009, pet. granted), in support of his contention that his claims are not health care liability claims.   In each of these cases, it was determined that allegations of injury resulting from laser hair removal were not health care liability claims; thus, Cannon maintains, Chapter 74 did not apply.   These holdings were, in large part, based on the definition of "treatment."[3]

In *Tesoro*, the Corpus Christi court was faced with the question of whether a patient who was scarred as a result of laser hair removal at a medical clinic and who sued the physician/general

---

[2]Under the statute, "[h]ealth care provider" is defined as

> any person, partnership, professional association, corporation, facility, or institution duly licensed, certified, registered, or chartered by the State of Texas to provide health care, including: . . .
>
> . . . .
>
> > (ii) an employee, independent contractor, or agent of a health care provider or physician acting in the course and scope of the employment or contractual relationship.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(12).   Cannon does not challenge Stanford's status as a health care provider.

[3]In addition to *Tesoro* and *Ghazali*, two additional cases discuss the issue of whether laser hair removal treatment amounts to health care.   Both cases conclude that health care liability claims were asserted.   *See Kanase v. Dodson*, 303 S.W.3d 846 (Tex. App.—Amarillo 2009, no pet.) (Direct liability claim against physician-owner of laser hair removal clinic for burns sustained during procedure conducted by clinic employee.   Allegations of failure to properly train and supervise employees in use of laser hair removal device are integral components of rendition of health care.); *Sarwal v. Hill*, No. 14-01-01112-CV, 2002 WL 31769295 (Tex. App.—Houston [14th Dist.] Dec. 12, 2002, no pet.) (allegations of compliance with Article 4590i and that nurse breached nursing standards of care and violated Texas Nurse Practice Act regulations in conducting laser hair removal procedure framed only as health care liability claim).   Because this case does not involve direct allegations of negligent supervision or breach of the medical standard of care, we consider *Kanase* and *Sarwal* in our analysis only to note the pleadings here do not *explicitly* support the conclusion that a health care liability claim was asserted.

partner of the clinic, alleging vicarious liability for the clinic's nurse in removing hair from her legs, was a health care liability claim. The nurse was alleged to have been negligent in improper deployment of the laser hair removal device. *Tesoro* most notably stands for the proposition that laser hair removal is not "health care" because the plaintiff was not "treated" as that term is used by medical definition.[4] *Tesoro*, 281 S.W.3d at 659.

The term "treatment" is not defined in Chapter 74. Section 74.001(b) of the Texas Civil Practice and Remedies Code provides that "[a]ny legal term or word of art used in this chapter, not otherwise defined in this chapter, shall have such meaning as is consistent with the common law." TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(b) (West 2011). *Tesoro* adopted the definition of "treatment" in a medical context, thus rejecting the Webster's Collegiate Dictionary definition of that term.[5] In the medical context, the *Tesoro* court determined that treatment was defined as "the care and management of a patient to combat, ameliorate, or prevent a disease, disorder, or injury." *Tesoro*, 281 S.W.3d at 659 (quoting MOSBY'S MEDICAL DICTIONARY 1880 (8th ed. 2009)).[6] Based on the definition of "treatment" in the medical context, the record did not support a determination that the laser hair removal procedure was "to combat, ameliorate, or prevent a

---

[4]The trial court also concluded that improperly using a laser is not an inseparable part of the rendition of health care services. *Id*. at 666.

[5]"The term 'treatment' is defined in common usage as 'the act or manner or an instance of treating someone or something' and as 'the techniques or actions customarily applied in a specific situation.' MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1333 (11th ed. 2003)." *Tesoro*, 281 S.W.3d at 659.

[6]The court also quoted the Medline Plus online dictionary definition of "treatment" as "the action or manner of treating a patient medically or surgically" and "treat" as "to care for or deal with medically or surgically: deal with by medical or surgical means." *Id.* (quoting MEDLINE PLUS, http://www.nlm.nih.gov/medlineplus/mplusdictionary.html). This definition was quoted, but was not utilized in the Court's decision.

9

disease, disorder, or injury." *Id.* Moreover, *Tesoro* rejected the contention that because a medical history was taken prior to the laser hair removal procedure, the procedure amounted to health care. The appellate record did not contain the medical history, consent forms, or progress notes allegedly generated. The fact that the procedure took place in a medical clinic could not, by itself, transform the conduct into "health care." *Id.* at 660. The court also rejected Tesoro's argument that because the hair removal procedure involved a regulated medical device, "health care" forms the basis of the allegations. The restrictions Tesoro relied on related to labeling requirements, and were relevant to misbranding violations, but did not form a predicate for a health care liability claim.

Finally, of significance to the court in *Tesoro* was the fact that the laser hair removal device could (then, as with the case before us) be used by a lay person in the absence of a supervising physician or a health care provider. Because Tesoro did not supervise or participate in the laser hair removal procedure, no doctor-patient relationship existed. The court, therefore, concluded that the laser hair removal procedure in that circumstance did not involve treatment related to health care; thus, the plaintiff did not assert a health care liability claim. *Id.* at 666.

We acknowledge the similarities of this case to *Tesoro*. The petition here, as in *Tesoro*, alleges vicarious liability against the physician. In both cases, the procedure was conducted by an employee of the physician (in this case, a technician; in *Tesoro*, a nurse). At the time of both

10

procedures, the use of a laser hair removal device was unregulated.[7]   There were no requirements

regarding credentialing or licensure of individuals operating laser hair removal devices.  *Id.* at

665.   In both cases, a laser hair removal device could be used without a physician or health care

provider present.   There are important factual distinctions between *Tesoro* and the case before us.

Unlike *Tesoro*, this case involves supervision of the laser hair removal procedures by a

licensed physician.   Moreover, the overall context in which the procedures were administered

indicates they were conducted as medical procedures.   *See id.* at 659 (context in which procedure

occurs may include factors to consider in determining whether claim is for "health care").   The

record here includes medical documentation[8] of the type typically encountered in the records of a

physician or medical clinic.   Stanford signed authorization forms identifying him as the

"[p]atient," which indicated that the hair removal process would be supervised by Thomas, a

physician.   Stanford relies on the medical records (reports of procedures performed on Cannon)

and the fact that Thomas signed those records (thus supervising, in essence, those procedures) in

support of his contention that this is a health care liability claim, citing *Rubio*, 185 S.W.3d at 848

(cause of action alleges departure from accepted standards of medical care or health care if act or

omission complained of is inseparable part of rendition of medical services).   Thomas' signature

---

[7]Although the operation of a laser hair removal device was not subject to regulation by the State at the time this cause of action arose, it is now regulated.  *See* TEX. HEALTH & SAFETY CODE ANN. §§ 401.501–.522 (West 2009).  As a result of this change in the statutory law, the application of this case as future precedent is likely quite limited.
[8]*Tesoro* could not consider the documentation factor because the record failed to include referenced documentation such as a completed medical history.  *Tesoro*, 281 S.W.3d at 660.

11

on the progress notes indicates that he reviewed the chart and that he agreed with the "treatment/s and parameters as indicated."

Thomas signed the medical records, authored by Stanford, after the fact.[9] Cannon urges there can be no physician-patient relationship in such a situation, urging that "the duty to treat the patient with proper professional skill flows from the consensual relationship between the patient and physician, and only when that relationship exists can there be a breach of a duty resulting in medical malpractice." *Ramirez v. Carreras*, 10 S.W.3d 757, 761 (Tex. App.—Corpus Christi 2000, pet. denied). We cannot overlook the fact that Cannon consented to have these procedures conducted under Thomas' supervision and control and that Thomas approved of the "treatment/s and parameters" indicated. The fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician-patient relationship. *Lection v. Dyll*, 65 S.W.3d 696, 704 (Tex. App.—Dallas 2011, pet. denied). Likewise, physical contact between a doctor and patient is not necessary to create a physician-patient relationship. *See Dougherty v. Gifford*, 826 S.W.2d 668, 674 (Tex. App.—Texarkana 1992, no writ) (physician-patient relationship existed between patient from whom biopsy was taken and doctors at laboratory examining biopsied tissue negligently misdiagnosed malignant cancer). The fact that Thomas reviewed and

---

[9]Stanford claims that obtaining consent for a procedure, as was done here, is an inseparable part of the rendition of medical care. In support of this proposition, Stanford relies on Section 74.101 of the Texas Civil Practice and Remedies Code, which provides that when a suit against a health care provider or physician is based on the "failure of the physician or health care provider to disclose or adequately disclose the risks and hazards involved in the medical care or surgical procedure rendered . . . , the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent." TEX. CIV. PRAC. & REM. CODE ANN. § 74.101 (West 2011). Here, Cannon does not complain of the failure to disclose risks associated with the laser hair removal procedure.

12

approved of the treatments Cannon received and that Cannon agreed to Thomas' supervision and control of the procedures, is sufficient to create a physician-patient relationship between Cannon and Thomas. In *Tesoro*, there was no physician-patient relationship.[10]

We also consider the fact that Cannon filled out a medical history questionnaire and signed a consent form in order to undergo these procedures. The medical history form was pertinent to the laser treatment and contained information which was necessary to an understanding of whether Cannon was a good candidate for the procedure, such as current medications and past and present health problems. Moreover, Cannon was considered (at least pursuant to documentation) a patient of the center, as he was designated in that manner on the consent form. The consent form was much the same as those commonly utilized in the arena of medical treatment. The risks, benefits, and complications associated with the procedure were disclosed. In addition, the consent form indicated that "medical personnel" were to perform the procedure under Thomas' "supervision and control." No such records were considered in *Tesoro*. Because these factors were lacking in *Tesoro*, we find the substance of the claims alleged here, in light of the overall context of the care provided, are markedly different from *Tesoro*.

This case is likewise distinguishable from *Ghazali*, in which the court determined that a claim against the medical director of the American Laser Center in Fort Worth for severe burning, blistering and lacerations to the plantiff's face and neck caused by laser hair removal treatment was

---

[10]The fact that Cannon did not allege a direct liability claim against Thomas only means that Thomas cannot be held directly liable for Stanford's alleged negligence; it does not mean that Cannon is free to ignore the physician-patient relationship and the supervising role Thomas played in the laser hair removal procedures.

13

not a health care liability claim. *Ghazali*, 307 S.W.3d at 505. Although Ghazali served as the facility's medical director at the time of Brown's initial treatment, center employees performed the actual treatment. The allegations in the *Ghazali* petition are direct liability claims. The interesting twist to this case is that despite the fact that the plaintiff filed an expert report within the 120-day period required by Section 74.351, the court nevertheless found that the claims asserted against Ghazali (negligence, negligent failure to warn, gross negligence, violations of the Texas Deceptive Trade Practices-Consumer Protection Act, fraud, and lack of informed consent) were not health care liability claims.[11]

In determining that laser hair removal did not constitute medical care or treatment, the *Ghazali* court defined "treatment" in accord with the definition of that term in *Mosby's Medical Dictionary*, although it did not state the rationale for the selection of this particular definition.[12] The court then quickly disposed of the issue of whether laser hair removal was a health care liability claim when it stated:

> The parties do not argue, and the record does not suggest, that Brown sought laser hair removal to "combat, ameliorate, or prevent a disease, disorder, or injury" or that the hair removal relates to a "physical disease or disorder or physical deformity or injury." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a) (19); TEX. OCC. CODE ANN. § 151.002(13); Mosby's Medical Dictionary 1880 (8th ed. 2009).

---

[11]After the plaintiff served an amended expert report, the trial court denied Ghazali's second motion to dismiss. *Ghazali*, 307 S.W.3d at 502.

[12]In adopting this definition of "treatment," *Ghazali* merely states that "'[t]reatment' is defined by Mosby's Medical Dictionary as 'the care and management of a patient to combat, ameliorate, or prevent a disease, disorder, or injury.' Mosby's Medical Dictionary 1880 (8th ed. 2009). We will therefore use this definition in deciding whether laser hair removal constitutes medical care or treatment." *Ghazali*, 307 S.W.3d at 503.

14

> Therefore, Brown's laser hair removal is not "treatment" or "medical care." And because Brown's laser hair removal is not "treatment" or "medical care," it follows that it is also not "health care" because "health care" requires an act or treatment during the patient's medical care or treatment. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a) (10).

*Ghazali*, 307 S.W.3d at 503–04 (footnote omitted).[13] Unlike this case, *Ghazali* did not involve a physician-supervised course of treatment, medical records, a consent form that stated the risks and benefits of treatment, or a physician-patient relationship. We, therefore, look beyond the holdings of *Tesoro* and *Ghazali* to determine whether the claim here is for health care liability.

A final factor in our consideration of this issue is whether expert medical testimony would be required to prove the alleged negligence. *Rubio*, 185 S.W.3d at 848 (a factor in considering whether cause of action is inseparable part of rendition of health care services is whether expert testimony from a medical or health care professional is necessary to prove claim); *San Antonio Extended Med. Care, Inc. v. Vasquez*, 327 S.W.3d 193, 199 (Tex. App.—San Antonio 2010, no pet.). Cannon alleged his injuries were proximately caused by Stanford's negligence in failing to skillfully and properly use the laser device and in failing to stop the laser treatment in a timely manner. Stanford contends that expert medical testimony would be required to prove each of these claims.

---

[13]*Ghazali* also rejected the contention that laser hair removal was an inseparable part of the rendition of medical services. TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13). However, *Ghazali* relied on *Marks v. St. Luke's Episcopal Hosp.*, No. 07-0783, 2009 WL 2667801 (Tex. Aug. 28, 2009), in support of this proposition. The original *Marks* opinion was withdrawn and superseded on rehearing by *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658 (Tex. 2010) (finding hospital patient's fall, caused by defective or unsafe hospital bed, is health care liability claim).

15

Indeed, expert testimony would be required to establish the appropriate laser hair removal device settings for removal of hair from the genital area, as well as to establish the appropriate use of the device once the settings were established. Stanford consulted with a physician, Dr. Birken,[14] to verify the settings for the Nd-Yag laser to be utilized on the genital area. Thomas approved of those settings and of the parameters of treatment. Cannon contends that because lay persons routinely operate laser hair removal devices without medical supervision or guidance, any needed expert testimony could be elicited from a technician trained in the use of the laser hair removal device as opposed to seeking the same information from a physician. Whereas this may be true in a case in which a laser hair removal device is operated without medical supervision or guidance, we do not believe it is true here.

Even though Stanford was trained in the use of the laser hair removal device, she nevertheless sought a physician's advice on the appropriate settings in this particular circumstance. The question of whether these settings were appropriate falls directly within Cannon's allegation that Stanford failed to "skillfully and properly use the laser device." We believe the question of the skillful and proper use of a laser hair removal device, under the circumstances of this case, is a question requiring expert testimony from a medical or health care

---

[14]The progress notes do not clearly identify Stanford's connection to Dr. Birken (whose first name is not mentioned); they merely state, "I have called Dr. Birken to verify settings for this particular area. Dr. Birken advises to use settings specific to his skin type without tanning."

16

professional.[15]   This conclusion is highlighted by the fact that the procedures here were undertaken with the advice and approval of two medical doctors.[16]   Expert medical testimony is required to establish whether the laser hair removal device was correctly calibrated, whether the correct attachment was utilized, and whether the procedure should have been performed in a shorter time span.   Such information is not within the common knowledge of the general public. *See Rose*, 156 S.W.3d at 544.[17]

Obviously, certain medical procedures constitute medical treatment under the most commonly utilized definitions of that term.   In those circumstances, there is little or no debate on the issue of whether such treatment actually occurred.   Here, we are faced with a unique set of facts that go beyond the *Tesoro* and *Ghazali* formulations.   This scenario, likewise, does not fall within the parameters of *Kanase*[18] and *Sarwal*[19] (finding pleadings in laser hair removal case

---

[15]There was no claim in *Tesoro* that expert testimony was necessary to establish that the laser hair removal device was improperly utilized.   The court determined that because the claims did not constitute health care liability claims invoking Chapter 74, the issue of expert testimony need not be addressed.   *Tesoro*, 281 S.W.3d at 659.

[16]We recognize current statutory law (enacted after Cannon's procedures) requires extensive training and certification of laser hair removal device technicians.   Cannon argues that this new legislation demonstrates that expert medical testimony would not be required, while Stanford contends that because the new legislation requires a consulting physician to establish protocols for services provided at a laser hair removal facility, only expert medical testimony will suffice.   *See* TEX. HEALTH & SAFETY CODE ANN. § 401.510.   The determination of the need for expert medical testimony is a fact specific determination, which cannot be made solely in reference to these statutory provisions. Further, these provisions were not in effect at the time of Cannon's treatment.

[17]Even if testimony of a laser hair removal device technician is sufficient to establish the appropriate operation and settings of a laser hair removal device in this circumstance, the fact that expert medical testimony may not be necessary to support a verdict does not necessarily mean that a claim is not a health care liability claim under Chapter 74.   *Med. Hosp. of Buna Tex., Inc. v. Wheatley*, 287 S.W.3d 286, 294 n.2 (Tex. App.—Beaumont 2009, pet. denied) (citing *Murphy*, 167 S.W.3d at 838).

[18]*Kanase*, 303 S.W.3d 846.

17

allege health care liability claim).  In this unique circumstance, we must look to the overall context of the claims, as well as to the physician-patient relationship involved in order to determine whether Cannon asserted a health care liability claim.

Here, we look to the following factors:  (1) medical records ("progress notes") were generated in connection with each of the two procedures performed on Cannon, (2) Thomas signed those progress notes, indicating his agreement with the treatment given and to the fact that he was led to believe that his treatment would be supervised by a physician, (3) Cannon was designated as a patient, (4) a consent form was obtained which not only outlined the risks of the procedure, but that also indicated that Cannon consented to allow "the medical personnel at Cosmetic Skin Laser & Hair Removal of Greenville under the supervision and control of Jack Thomas M.D." to perform the procedure, (5) a detailed medical history was taken, and (6) expert medical testimony is required to prove Cannon's claims.

These factors indicate that the underlying nature of Cannon's claim, regardless of how it was pled, is one for health care liability.   Here, the alleged improper use of the laser hair removal device was an inseparable part of the rendition of medical services.  *See Rubio*, 185 S.W.3d at 848–49.   Cannon was, therefore, subject to the requirements of Section 74.351 because his suit asserts a health care liability claim.  *See Rose*, 156 S.W.3d at 546.

---

[19]*Sarwal*, 2002 WL 31769295.

18

## III.    CONCLUSION

We reverse the judgment and remand to the trial court for further proceedings consistent with this opinion.



Bailey C. Moseley
Justice


Date Submitted:     June 8, 2011
Date Decided:       June 23, 2011

19